1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION

3
     ROGER CORONADO, JR.,                    )
4                                            )
                    Plaintiff,               )
5                                            )
                                             )
6    -vs-                                    )    Case No. 08 C 1254
                                             )
7                                            )    Chicago, Illinois
     VALLEYVIEW PUBLIC SCHOOL                )    March 12, 2008
8    DISTRICT, 365-U, et al.,                )    1:00 o'clock p.m.
                                             )
9                    Defendants.             )

10
                    TRANSCRIPT OF PROCEEDINGS
11        BEFORE THE HONORABLE JOHN W. DARRAH

12   APPEARANCES:

13   For the Plaintiff:        LAW OFFICES OF CHRISTOPHER COOPER
                               MR. CHRISTOPHER C. COOPER
14                             P.O. Box 1225
                               Hammond, Indiana  46325
15
     For the Defendants:       CLAUSEN MILLER, P.C.
16                             MR. BRIAN JAMES RIORDAN
                               10 South LaSalle Street
17                             Suite 1600
                               Chicago, Illinois 60603
18

19
     Court Reporter:
20
                          Mary M. Hacker
21                     Official Court Reporter
                    United States District Court
22           219 South Dearborn Street, Suite 1426
                     Chicago, Illinois  60604
23               Telephone:   (312) 435-5564

24

25

1   Mr. Riordan.

2      (Discussion had off the record.)

3   BY MR COOPER:

4   Q.  Mr. Prodehl, did Mr. Coronado say anything to you?

5   A.  He said hello.  We had a conversation before the hearing

6   in chief started.

7      THE COURT:  You're talking about the student, Roger

8   Coronado, is that right, Mr. Prodehl?

9      THE WITNESS:  Oh, the students?

10      THE COURT:  Who are you referring to?

11      MR. COOPER:  The parent, Roger, Sr.

12   BY THE WITNESS:

13   A.  I talked to Roger, Sr., the father.

14   BY MR. COOPER:

15   Q.  What did you talk about?

16   A.  Again, the fact that -- you know, there's kind of a

17   formula that I go through as far as the introduction and

18   explanation as to why the hearing is taking place and what

19   the procedure is.

20   Q.  And what language did you speak?

21   A.  We spoke in English.

22   Q.  Did Mr. Coronado ask you anything?

23   A.  He asked me -- I think he may have asked some particular

24   questions but --

25   Q.  What were those questions?

Prodehl - direct

1  A.   I don't recall the specifics.  I did ask him if we could
2  get to his --
3         THE COURT:  Mr. Cooper, excuse me.  Move over in
4  front of that microphone, would you, please?
5         MR. COOPER:  Yes.
6  BY MR COOPER:
7  Q.   Do you recall -- I'm sorry, Mr. Prodehl.  Continue.
8  A.   Yes.  I asked at some point if they needed the use of an
9  interpreter.
10  Q.   You asked them?
11  A.   Yes, I do -- I generally will ask many people --
12  frankly, if I perceive that they are Hispanic, if they
13  understand English and if they need an interpreter.
14  Q.   How did you ask the question?
15  A.   I asked, do you understand English, do you need an
16  interpreter?
17  Q.   This is after you had the conversation with Mr.
18  Coronado?
19  A.   This is within the sum and substance of that
20  conversation.
21  Q.   What did Mr. Coronado say?
22  A.   Mr. Coronado said, no, he understood pretty good.  And
23  in our conversations it became very evident that he and I
24  could hold a conversation.  But I told him if there was any
25  problems, to let me know and I would make arrangements for an

1  interpreter because, frankly, we use interpreters fairly

2  often in the hearings and it's not a particular problem to

3  have an interpreter present.

4  Q.   Did Roger's parents -- correction.

5       Did Mr. And Mrs. Coronado write or sign anything at

6  the hearing?

7  A.   They signed their name to a copy of a statement that

8  their son wrote.

9  Q.   And what was that statement?

10 A.   The statement that Roger, the student, made in regards

11 to his involvement in an incident in the cafeteria.

12 Q.   And when was the statement made?

13 A.   I believe it was made the day that the incident

14 happened.

15 Q.   And what day was that?

16 A.   I would have to look at the document to --

17 Q.   Was it February 19th?

18 A.   If that's the date that's on the referral, then -- nope,

19 that's not correct.

20      THE COURT:   What date was your hearing, Mr.

21 Prodehl?

22      THE WITNESS:   February 19th, your Honor.

23      THE COURT:   The hearing was on the 19th,

24 Mr. Cooper.

25 BY THE WITNESS:

1    A.    Roger, the student, wrote his statement prior to the

2    hearing, on the date of the incident, I believe.  And the

3    date of the incident, I believe, was February 4th.

4    BY MR. COOPER:

5    Q.    Mr. Prodehl, I'm going to hand you a document that's

6    marked Plaintiff's Exhibit No. 7.  I want you to look at

7    Paragraph 2.

8              MR. RIORDAN:  Objection, your Honor.  This is a

9    piece of -- our response to his motion for the injunction.

10   It's already been ruled upon.  And I'm assuming he's going to

11   start asking questions about something --

12             THE COURT:  Where are you going with this,

13   Mr. Cooper?

14             MR. COOPER:  Your Honor, the second paragraph

15   indicates that Exhibit B, the alleged voluntary statement of

16   Mr. Roger Coronado, was written and taken at the hearing.  In

17   fact, this statement was written on February 7th.

18             THE COURT:  If you're going to impeach him with

19   that piece of paper, it's got to be something that he

20   authored.

21             MR. RIORDAN:  Your Honor, I object.  That's what it

22   even says.  It's talking about a number of admissions that

23   the plaintiff made, one of them which was at the hearing,

24   along with his written statement from a week earlier.

25             THE COURT:  Okay.  The objection to that intended

1    use of Plaintiff's 7 is sustained.

2    BY MR COOPER:

3    Q.   Mr. Prodehl, did you write a statement or a summary?

4    A.   As part of the report that I give to the board, yes, I

5    did.

6    Q.   And do you have that summary with you?

7    A.   I believe that it is in the exhibit book that I have in

8    front of me here.

9    Q.   Did Roger write anything at the hearing?

10   A.   No, I don't believe he did.

11          No, he did not.

12   Q.   He did not.

13          Is this your statement?

14          THE COURT:   Did you give counsel a copy of that,

15   first?

16          MR. COOPER:   Yes, your Honor.

17          Right now we have a problem --

18          THE COURT:   Hold on.  Stop.  Wait.

19          Before you hand something to the witness, let

20   counsel see it.

21          MR. COOPER:   Yes, your Honor.

22       (Document tendered.)

23   BY MR. COOPER:

24   Q.   Mr. Prodehl, take your time and look at that statement,

25   please.

1          THE COURT:  What have you handed him?

2              (Brief pause.)

3          THE COURT:  What have you handed him, Mr. Cooper?

4    What is he looking at?

5          MR. COOPER:  Your Honor, we have copies.  The

6    problem is somehow --

7          THE COURT:  Wait.  Mr. Cooper, slow down.

8          Can you tell me what it is he has in his hand?

9          MR. COOPER:  He has the statement that he wrote,

10   your Honor.

11         THE COURT:  Is there an exhibit designation on

12   that?

13         MR. COOPER:  There is, your Honor.

14         THE COURT:  What is the exhibit designation?

15         MR. COOPER:  Your Honor, the problem is we cannot

16   find it.

17         MR. RIORDAN:  I think I can help, your Honor.

18         As part of Exhibit 6 to the exhibit book that is in

19   front of both the Judge, the witness, and now in front of Mr.

20   Cooper, is two pages of a six-page report that he filed after

21   his hearing.  It's a summary.

22         THE COURT:  Okay.  Why don't you just call that --

23   is that your copy?  Why don't you just give it an exhibit

24   number so we know what we're talking about?

25         MR. COOPER:  Your Honor, we've given it an exhibit

1    number as Exhibit 7.  The problem is we can't find Exhibit 7.

2           THE COURT:  Well, you found two pages of Exhibit 7.

3    Why don't you mark them something so we know what we're

4    talking about.

5           MR. COOPER:  Yes, your Honor.

6    BY MR. COOPER:

7    Q.   Mr. Prodehl, that's a statement that you wrote --

8           THE COURT:  Hold it.  Stop.  Let me see what you

9    have.

10          (Document tendered.)

11          THE COURT:  Okay.  We'll call this Plaintiff's

12   Exhibits A and B.  And the first page will be A; that's

13   entitled Valleyview Public School Community Unit 365U,

14   District Hearing Officer's Report.  And the page behind that

15   which begins Hearing Officer's Recommendations will be called

16   Exhibit B.

17          MR. COOPER:  Thank you, your Honor.

18          THE COURT:  Okay.

19          MR COOPER:  We have it, your Honor.

20          THE COURT:  We're going to have to move this along,

21   gentlemen.  We don't have the whole afternoon here.

22   BY MR. COOPER:

23   Q.   Please look at the first paragraph.  Please summarize

24   the first paragraph.

25          THE COURT:  No, that's not proper.  If you want to

1    move the admission of this and I'll read the first paragraph,

2    somebody can read it, but it's not proper for him to

3    summarize something.

4                Do you want to just ask a question, Mr. Cooper?

5                MR. COOPER:  Yes, your Honor.

6                In the interest of time, I assumed it would be best

7    if he summarized it.

8                But, yes, your Honor -- if Mr. Prodehl could read

9    perhaps one sentence --

10               THE COURT:  Any objection to deeming these two

11   pages in evidence?

12               MR. RIORDAN:  No, your Honor.  In fact, we are

13   moving the whole packet to go in evidence.

14               THE COURT:  Plaintiff's Exhibits A and B are in

15   evidence.

16           (Said exhibits were received into evidence.)

17   BY MR. COOPER:

18   Q.   Mr. Prodehl, do you see the paragraph that begins with

19   suddenly -- correction, the sentence that begins with

20   suddenly in the first paragraph?

21   A.   The first paragraph --

22               THE COURT:  I don't see suddenly either.

23               MR. COOPER:  The first time offender

24   recommendation.

25               THE COURT:  The second paragraph?

1         MR. COOPER:  Okay, the second paragraph.

2         THE COURT:  What --

3    BY MR. COOPER:

4    Q.   Do you see the word suddenly?

5    A.   In the second paragraph?

6    Q.   Yes.

7    A.   Of the student's summary?  Because I have -- I have two

8    paragraphs here.  One is a summary of what the --

9    Q.   Do you see the First Time Offender Recommendation?

10   A.   Oh, on the first page?

11   Q.   Yes -- no.  You're looking at your statement.

12        MR. RIORDAN:  Objection to calling it a statement,

13   your Honor.

14        THE COURT:  Sustained as to the form of that

15   question.

16   BY MR COOPER:

17   Q.   Mr. Coronado, what is this document called?

18   A.   This is the Hearing Officer Report.

19   Q.   Did you write this report?

20   A.   Yes, I did.

21   Q.   Do you see the word suddenly in the paragraph under

22   First Time Offender Recommendation?

23   A.   About one, two, three, four, five, six, seven -- eight

24   lines down?

25   Q.   That's it.

1   THE COURT:  Why don't you read that.

2   BY MR COOPER:

3   Q.   Could you read to the end please?

4   A.   (Reading:)  Suddenly a large group of people jumped up

5   and stood behind the other students, and then his table of

6   people stood up and went behind their guy as if to protect

7   him.

8   Q.   Continue, please.

9   A.   (Continuing:)  Both sides started throwing gang signs at

10  each other and yelling gang slogans.

11  Q.   Continue, please.

12  A.   (Continuing:)  Roger stated that he did walk over and

13  lent support to his table, some of whom he knows are Latin

14  Kings.

15  Q.   Who did he say that to, Mr. Prodehl?

16  A.   He said that to me at the hearing.

17  Q.   Did he say anything else?

18  A.   Well, he said a number of things.  He stated that he did

19  not throw any gang signs.

20  Q.   Okay.

21  A.   He stated he did not shout any gang slogans.  He stated

22  he does not belong to any gang.  He stated he should have

23  acted differently and what he did was very stupid, especially

24  when he's not that good of friends with any of them.

25  Q.   Did he say anything else?

1   A.   Not of any substance that I can recall because I tried

2   to, in my summary, put what I thought was relevant or

3   important.

4   Q.   Do you see the words First Time Offender Recommendation?

5   A.   Yes.

6   Q.   What is your response?

7   A.   The response is no.

8   Q.   What was Roger's first offense?

9   A.   This is a generic form that I use.  The first time

10  offender is used -- is recommended sometimes by the school in

11  situations where there is possession of drugs.

12        In the case of where a student then is caught with

13  a joint in his pocket or a nickel bag in his pocket, and if

14  he meets certain qualifications, the school sometimes will

15  recommend that he receive first time offender's probation.

16  Q.   What does "no" mean on this piece of paper?

17  A.   It means no.

18  Q.   No what?

19  A.   No recommendation for first time offender.

20  Q.   Mr. Prodehl, the question is whether or not Roger is a

21  first time offender.  Is he a first time offender?

22  A.   As far as this particular charge or as far as his

23  probation record or discipline history?

24  Q.   Tell me what this piece of paper refers to when it says

25  that he's not a first time offender?

1          MR. RIORDAN:  I am going to object to that's what

2    it says.  He's asking if --

3          THE COURT:  I think he's explained that to you,

4    Mr. Cooper.  I think what he's explained is there is a

5    program where someone can be dealt with as though they were a

6    first time offender, and that he decided that, no, that was

7    not appropriate for Roger.

8          Is that your testimony?

9          THE WITNESS:  Yes, sir.

10   BY MR COOPER:

11   Q.   Why wasn't it appropriate for Roger?

12   A.   Because it was not drug related.

13   Q.   So is Roger a first time or a second time offender?

14   A.   In regards to his discipline history?

15   Q.   Anything.

16   A.   I do not know.

17   Q.   Then why did you write no?

18   A.   Because he does not quality --

19          MR. RIORDAN:  Objection.

20   BY THE WITNESS:

21   A.   He does not qualify for first time offender.

22          THE COURT:  We can move on from this now, Mr.

23   Cooper.

24   BY MR COOPER:

25   Q.   Close to the bottom you wrote, parents informed of all

1    rights and opportunities of appeal.  Is that correct?

2    A.   That's what is written there.

3    Q.   And you circled -- or you wrote no.  Is that correct?

4    A.   Correct.

5    Q.   Why did you write no?

6    A.   Because they did not request information as to their

7    appeal rights in the event that they received a decision that

8    they did not agree with.

9    Q.   Doesn't this question refer to their rights in general

10   in addition to their appeal rights?

11   A.   No.  It refers to whether or not they have requested

12   information on appealing the decision.

13   Q.   Did you give them any information as to how to appeal?

14   A.   No, I did not.

15   Q.   Why not?

16   A.   They did not ask.

17   Q.   How did you gather the information for your report?

18   A.   The school gathers the information and submits it to me.

19   It's normally in the form of written reports and/or verbal

20   testimony.

21   Q.   Who was the complainant?

22   A.   The complainant?

23   Q.   Yes.

24   A.   It would be the Bolingbrook High School.

25   Q.   Who?

1 | A.    Bolingbrook High School.

2 | Q.    Who is Mr. Gavin?

3 | A.    Mr. Gavin is a security officer.

4 | Q.    When did you talk with him?

5 | A.    I did not talk with him at the hearing.    There was a

6 | written report from him.

7 | Q.    Who is Officer Hampton?

8 | A.    He's an officer in the school.

9 | Q.    When did you talk to him?

10 | A.    I did not talk to him.

11 |           THE COURT:    Who was the second policemen, Officer

12 | Hampton?

13 |           MR. COOPER:    Hampton, your Honor, H-A-M-P-T-O-N, I

14 | believe.

15 |           THE COURT:    How much more do you have of this

16 | witness, Mr. Cooper?

17 |           MR. COOPER:    Maybe one or two more questions, your

18 | Honor.

19 |           THE COURT:    All right.

20 | BY MR. COOPER:

21 | Q.    How do you conduct an investigation, Mr. Prodehl?

22 | A.    I do not do investigations.

23 | Q.    What do you do?

24 | A.    I do a hearing as far as receiving information from both

25 | sides in coming to a conclusion as to whether the burden of

1  proof has been met.

2  Q.  Where is the transcript of the hearing?

3  A.  There is no transcript.

4  Q.  Why not?

5  A.  It was not recorded.

6  Q.  You are a lawyer, correct?

7  A.  Yes, I am.

8      MR. RIORDAN:  Objection; relevance that he's a

9  lawyer.

10     THE COURT:  Overruled.

11 BY MR COOPER:

12 Q.  Mr. Coronado, I've handed you a document listed as

13 Plaintiff's Exhibit 3.

14     MR. RIORDAN:  Just for the record, your Honor,

15 these documents are stapled together.  They are not in

16 consecutive order, they are not -- a two-page document, if

17 you will.  Just so you know.

18     THE COURT:  All right.

19 BY MR COOPER:

20 Q.  Do you recognize this document, Mr. Prodehl -- or the

21 documents?

22 A.  Yes.

23 Q.  What are they?

24 A.  One is the referral, student referral, in regards to

25 Roger Coronado, and the other is a copy of the statement

1    written by Roger Coronado.

2    Q.   Did you use either of those pieces of paper in coming to

3    a decision as to Roger's expulsion?

4    A.   Yes, I did.

5    Q.   Both?

6    A.   I used everything that comes before me.

7    Q.   Who prepared the top copy?

8    A.   Are you referring to the referral?

9    Q.   Yes.

10   A.   I assume it's -- I do not know specifically.  I assume

11   it would be -- the person making the report, I believe, was

12   Officer Gavin.

13   Q.   Then he's the complainant?

14   A.   He is the witnessing officer.

15   Q.   You did not talk to him?

16   A.   No.

17               THE COURT:  Be mindful of the time, Mr. Cooper.

18   Allocate the time you need.

19               MR. COOPER:  At this point, your Honor, I'm done

20   with this witness.  Thank you.

21               Thank you, Mr. Prodehl.

22               THE COURT:  Thank you.

23               Do you have any questions, Mr. Riordan?

24               MR. RIORDAN:  I do.

25               THE COURT:  You may inquire.

Prodehl   cross

1  Mr. Hampton or Mr. Gavin in addition to make your ruling?

2  A.   No.

3  Q.   Do you have any reason to doubt or to question the

4  veracity of the documents that you were given regarding Mr.

5  Gavin and Mr. Hampton?

6  A.   No.

7            MR. RIORDAN:   Those are the only questions I have

8  for you, sir.   Thank you.

9            MR. COOPER:   I'll be brief, your Honor.

10           THE COURT:   All right.

11                    REDIRECT EXAMINATION

12  BY MR COOPER:

13  Q.   Did you send a copy of a letter in the Spanish language

14  to Mr. And Mrs. Coronado?

15  A.   No.

16  Q.   Who was Pablo Coronado?

17           Defendants' Exhibit No. 2 --

18           THE COURT:   Sit a little closer to that microphone.

19  BY MR COOPER:

20  Q.   Defendants' Exhibit No. 2 shows that you addressed the

21  letter to Pablo Coronado.   Who was Pablo Coronado?

22  A.   It was not sent to Pablo Coronado.   It was sent to

23  Mr. Regilio Coronado.

24  Q.   You don't see Pablo Coronado written on there?

25  A.   I see Pablo Coronado but it was not sent to him.

1    A.    February 19th.

2    Q.    Before or after Mr. And Mrs. Coronado signed it?

3    A.    Before they signed it.

4    Q.    You're saying they saw that line?

5    A.    I explained it to them before they signed it.

6    Q.    In English or Spanish?

7    A.    In English.

8    Q.    What did you say to Mr. Coronado about a ticket?

9    A.    I don't specifically recall about a ticket.

10        Sometimes I will ask if the student has received a

11   citation type ticket from the police officer from within the

12   school.  It's possible I may have asked that because I do

13   that -- I've had cases where the parents will come to the

14   hearing and think that this hearing is in regard to that

15   citation.  I always like to make sure that they understand

16   that they still have to respond to the citation, that that is

17   a separate hearing or court appearance that they have to deal

18   with.

19   Q.    Wasn't Roger Coronado, Jr., entitled to cross-examine

20   Mr. Hampton and Mr. Gavin at the hearing?

21        MR. RIORDAN:  Objection.  It calls for a legal

22   conclusion.

23        THE COURT:  Sustained.

24   BY MR COOPER:

25   Q.    Was it --

1    THE COURT:  You can argue that to me.

2         Were those people at the hearing, Mr. Prodehl?

3         THE WITNESS:  No, sir.

4    THE COURT:  You can argue that.  That is a legal

5    conclusion.

6         MR. RIORDAN:  We can find case law that

7    specifically says they are not required to name or to have

8    him present at the hearing.

9         THE COURT:  So far you're winning on that

10   objection.

11   BY MR COOPER:

12   Q.  Why wasn't Mr. Gavin summoned to the hearing?

13   A.  He was not required to be there.  I had his written

14   report.

15   Q.  Then how could Roger Coronado, Jr., confront Mr. Gavin

16   if he wasn't there?

17        MR. RIORDAN:  Again, objection, your Honor.  It's

18   not required.

19        THE COURT:  Same ruling:  Sustained.

20   BY MR COOPER:

21   Q.  Why wasn't Mr. Hampton summoned to the hearing?

22        MR. RIORDAN:  Same objection to this line of

23   questioning, your Honor.

24        THE COURT:  You can answer that, Mr. Prodehl.

25        THE WITNESS:  Could you repeat the question,

1    please?

2    BY MR COOPER:

3    Q.   Why wasn't Mr. Hampton summoned to the hearing?

4    A.   He was not required to be there.  If there was any

5    reports from Mr. Hampton, I would have had that.

6    Q.   What about Roger Coronado having an opportunity to

7    confront his accusers?

8            MR. RIORDAN:  Objection, your Honor.

9            THE COURT:  Same ruling:  Sustained.

10   BY MR COOPER:

11   Q.   When would Roger Coronado have an opportunity to ask

12   questions of Mr. Gavin or Mr. Hampton?

13   A.   I suppose they could have requested him to be present

14   themselves.

15   Q.   Who is they?

16   A.   His parents or himself.

17   Q.   They could have requested what?

18   A.   They could have asked Officer Hampton to appear.

19   Q.   Wasn't that your responsibility?

20   A.   No.

21           MR. RIORDAN:  Objection, your Honor.

22           THE COURT:  That answer will stand.

23           You're going to have to move along here now,

24   Mr. Cooper.

25   BY MR COOPER:

Prodehl - redirect

1   Q.   You stated that the punishment was proportionate with
2   the offense, is that correct?
3   A.   Yes.
4   Q.   And what was Roger Coronado, Jr., charged with?
5   A.   Charged with subversive organizations and I believe that
6   was it.
7   Q.   Mr. Prodehl, I'm handing you Plaintiff's Exhibit No. 6.
8   And if you look at No. 41, 41 describes the offense for which
9   Mr. Coronado was charged, is that correct?
10  A.   That is the handbook.
11  Q.   Am I correct it means Subversive Organizations/Gang/Hate
12  Groups?
13  A.   That's the heading.
14  Q.   So what hate group or gang is my client a member of?
15  A.   I never said that he was a member of a gang.
16  Q.   Why did you charge him with No. 41, subversive
17  organizations?
18  A.   I did not charge him with that.
19  Q.   What did you charge him with?
20  A.   I did not charge him with anything.
21  Q.   Then why is 41 relevant? Why is 41 mentioned in several
22  documents, including Plaintiff's Exhibit 3?
23  A.   Because that's what I was informed, that the school was
24  alleging that he broke that particular rule.
25  Q.   But you did conduct the hearing, correct?

1  A.  Yes.

2  Q.  So what hate group is he a member of?

3       MR. RIORDAN:  Objection, your Honor.  It's

4  argumentative and he's already answered the question.

5       THE COURT:  Sustained.

6  BY MR COOPER:

7  Q.  One of the things you indicated is that my client

8  postured.  What did you mean by postured?

9  A.  I did not indicate that he postured.  That is what is

10 contained in the written referral.

11 Q.  But you did some sort of investigation, am I correct?

12 A.  I conducted a hearing.

13 Q.  You reviewed the documents that were given to you?

14 A.  Yes.

15 Q.  So what posturing did he do?  Can you describe it, use

16 your hands with your body to describe what he did?

17 A.  From the information that I received, he rose from the

18 table and he stood behind a group of students that were

19 engaged in activity towards another group.

20      THE COURT:  Mr. Cooper, how many witnesses do you

21 have?

22      MR. COOPER:  Four, your Honor.

23      THE COURT:  Well, you better marshal your time

24 because you have probably about an hour left, and I am going

25 to give the school board the same amount of time.

1    BY MR COOPER:

2    Q.   Mr. Prodehl, I'm handing you another document from the

3    school's handbook.   It refers to No. 20, Mob Action.   This is

4    Plaintiff's Exhibit No. 5.

5            Am I correct you held Mr. Coronado, Jr.,

6    responsible for a mob action?

7    A.   If I could just take a second to look at my report here?

8    Q.   Please.

9        (Brief pause.)

10   BY THE WITNESS:

11   A.   Yes, I did.

12   BY MR COOPER:

13   Q.   Are you familiar with the Court's decision in Chicago V.

14   Morales?

15           MR. RIORDAN:   Objection, your Honor.

16           THE COURT:   Sustained.

17   BY MR COOPER:

18   Q.   What did my client do that represented a mob action?

19   A.   He engaged in concert activity with a large group of

20   students that were engaged in aggressive type behavior.

21   Q.   Describe the aggressive type behavior, please.

22           MR. RIORDAN:   Objection, your Honor.   We've gone

23   through all this.   He summarized his testimony --

24           THE COURT:   Mr. Cooper, you can use your time as

25   you see fit, but you've used about an hour.

Prodehl - redirect

1    BY MR COOPER:

2    Q.    Describe the aggressive behavior, sir.

3    A.    There were gang signs being flashed, there were gang

4    slogans being shouted, there were threats being shouted --

5    Q.    Please show me the gang signs.

6    A.    Huh?

7    Q.    Please show me the gang signs.

8    A.    I did not see them.

9            MR. RIORDAN:  Objection.

10    BY MR. COOPER:

11    Q.    Who saw them?

12    A.    The security officer.

13    Q.    Why wasn't he at the hearing?

14            MR. RIORDAN:  Objection, your Honor.  Asked and

15    answered this twelve times now.

16            THE COURT:  Yes.

17            MR. COOPER:  No further questions, your Honor.

18            THE COURT:  Okay.  Do you have anything further?

19            MR. RIORDAN:  Just one thing to clear up about

20    notice following the school code.

21                    RECROSS EXAMINATION

22    BY MR. RIORDAN:

23    Q.    Go back to Exhibit 2, please, Mr. Prodehl.

24    A.    Which one?

25    Q.    Exhibit 2 of the handbook -- of the --

Prodehl - recross

1    A.   No. 2?

2    Q.   Yes.

3    A.   Okay.

4    Q.   The letter does reference Pablo Coronado but it's

5    directed to Mr. Regilio Coronado, is that correct?

6    A.   That's correct.

7    Q.   And if you go to the second page, there's a signature

8    that it was received and signed for by Mr. Regilio Coronado?

9    A.   Yes.

10   Q.   And he actually did show up at the hearing on the date

11   and time indicated?

12   A.   Yes.

13              MR. RIORDAN:   Okay.  That's all I have, your Honor.

14              THE COURT:   Anything further, Mr. Cooper?

15              MR. COOPER:   Thank you, Mr. Prodehl.

16              Mr. Gavin?

17              THE COURT:   You may step down.

18         (Witness excused.)

19         TIMOTHY J. GAVIN, PLAINTIFF'S WITNESS, DULY SWORN

20                    DIRECT EXAMINATION

21   BY MR. COOPER:

22   Q.   Please state your name for the record.

23              THE COURT:   Would you stand in front of that

24   microphone, please, Mr. Cooper?

25              MR. COOPER:   Yes, your Honor.

1 | BY THE WITNESS:

2 | A.   Timothy J. Gavin.

3 | BY MR. COOPER:

4 | Q.   You're employed by the Valleyview School District?

5 | A.   That's correct.

6 | Q.   What is your job?

7 | A.   Security.

8 | Q.   What does that entail?

9 | A.   It entails monitoring the hallways, monitoring the

10 | students, keeping the students and staff in a safe

11 | environment at all times.

12 | Q.   How old are you?

13 | A.   I'm 25.

14 | Q.   Is this your first law enforcement job?

15 | A.   That is not correct.  I am a United States Marine

16 | currently in reserves.  I've been there for eight and a half

17 | years.

18 | Q.   What's your job in the Marine Corps?

19 | A.   Infantry.

20 | Q.   What did you do on February the 4th, 2008?

21 | A.   Could you repeat the question?

22 | Q.   What did you do on February the 4th, 2008?

23 | A.   I went to work.

24 | Q.   Where?

25 | A.   Bolingbrook High School.

1    Q.   What did you do when you got there?

2    A.   I stayed in my positions, like I usually do during --

3    Q.   What is your position?

4    A.   During the appropriate hour of the school, depending on

5    what hour it is, I go to different positions --

6           THE COURT:   Why don't we get to the time of the

7    occurrence, Mr. Cooper.

8    BY MR COOPER:

9    Q.   Were you on cafeteria duty on February 4, 2008?

10    A.   That's correct.

11    Q.   More than once?

12    A.   Every lunch hour.

13    Q.   How many lunch hours were there on February 4th?

14    A.   There are six lunch hours.

15    Q.   Do you know who Roger Coronado is?

16    A.   Yes, I do.

17    Q.   Is he here?

18    A.   Yes, he is.

19    Q.   Why don't you point to him?

20    A.   He's the young man sitting right here. (Indicating.)

21    Q.   What did you see on February 4, 2008?

22    A.   I saw Roger Coronado join a group of Hispanic males,

23    facing off, confronting a group of black males.

24    Q.   How do you know he's Hispanic?

25    A.   I can only assume. I don't understand why --

1 | Q.  Assume what?
2 | A.  I don't understand the question.
3 | Q.  How do you know he's Hispanic?
4 | A.  I still don't understand the question.  I don't
5 | understand the question.
6 | Q.  Do you know what country his family is from?
7 | A.  No, I do not.
8 | Q.  But you assumed that he was Hispanic?
9 | A.  I was under no assumption of what race or what country
10 | he was from.
11 | Q.  Was he with the black males or the Hispanic males?
12 | A.  He was standing nearest the Hispanic males.
13 | Q.  Was he ever eating lunch?
14 | A.  That was his correct lunch hour.  I do not recall if he
15 | had actually a tray of food in front of him or not.
16 | Q.  Were the other people you identified as Hispanic males
17 | at their correct lunch hour?
18 | A.  No.
19 | Q.  Was he talking with the other Hispanic males?
20 | A.  He was sitting at the table with a few Hispanic males.
21 | Q.  Who was sitting there first?
22 | A.  At the table he was sitting at?
23 | Q.  Yes.
24 | A.  I don't know who got there first.
25 | Q.  Whose lunch hour was it?

1  A.   Excuse me?

2  Q.   Whose lunch hour was it?

3  A.   It was 5A and 5B --

4  Q.   Was it his lunch hour or the other people who you say

5  are Hispanic males?

6  A.   It was his lunch hour.

7  Q.   How do you know the other Hispanic males were not at

8  their correct lunch hour?

9  A.   Because we have what we call a frequent flyer list.

10  What it is, since there are security guards, three to four,

11  all day in the cafeteria, we get to recognize the students

12  over a time period, and we recognize them -- if they have

13  been in more than one lunch hour or not.

14  Q.   Do you know how many students Bolingbrook High School

15  has?

16  A.   Yes, I do.

17  Q.   How many?

18  A.   3,700.

19  Q.   3,700.

20       MR. RIORDAN:  Objection.  Very argumentative and --

21       THE COURT:  Where are we going with this,

22  Mr. Cooper?  I caution you, your time is going to be

23  allocated now.

24  BY MR. COOPER:

25  Q.   How do you know that he knew those other boys?

Gavin - direct

1   your presence.

2   A.   I witnessed many gang signs.  I don't know which one

3   relates to which group.

4   Q.   Sir, show me the gang signs this person threw in your

5   presence.

6   A.   I cannot recall off the top of my head what --

7   Q.   Did he throw any gang signs --

8           MR. RIORDAN:  Objection, your Honor.

9           THE COURT:  Let him finish his answer.

10          Let me see you at sidebar.

11          MR. COOPER:  Yes, your Honor.

12       (Discussion had off the record.)

13   BY MR. COOPER:

14   Q.   Mr. Gavin, in front of you you have some documents.  One

15   of the documents is marked as Plaintiff's Exhibit No. 3.

16          Do you recognize the top document, sir?

17   A.   Yes, I do.

18   Q.   What is the top document?

19   A.   It is a referral that I wrote in regards to Roger

20   Coronado.

21   Q.   And you checked the box Parent Conference?

22   A.   That is not correct.  I did not.

23   Q.   Who checked the box?

24   A.   I am unaware that -- that's not in my job description.

25   Q.   Do you see the box checked?

Gavin - direct

1    A.   Yes, I do.

2    Q.   Is that your handwriting?

3    A.   Yes, it is.

4    Q.   So you're saying there was a parent conference between

5    you and the Coronado parents?

6    A.   What this is is -- I do not fill out this whole thing.

7    I fill out the student's name, the time and date of the

8    incident, a description of the misconduct and my name, the

9    referring staff member.

10   Q.   Please read what you wrote, sir.

11   A.   (Reading:)  Roger Coronado was seen by myself posturing

12   with a large group in the cafeteria who were flashing gang

13   signs at a group of Gangster Disciples.

14   Q.   Please describe posturing by Roger Coronado, Jr.?

15   A.   Posturing, from what I wrote down, was being involved --

16   getting up to essentially back up his friends, associates, in

17   this -- contained in this large group.

18   Q.   Do you see a signature -- correction.

19          Do you see Roger Coronado's signature on that

20   document?

21   A.   Yes, I do.

22   Q.   How did it get there?

23   A.   When I write the referrals, I never see the signatures.

24   Like I said, the only thing that I see is the -- which I

25   wrote down, is the student's name, the time of day of the

1    incident, a description of the misconduct, and I sign it.  I

2    then return it and hand it to the dean, and the dean then

3    from there handles it.

4    Q.   When you received that document, was it blank?

5    A.   Yes.

6    Q.   Then you gave it to the dean?

7    A.   Correct.

8    Q.   Did you see it again?

9    A.   No.

10   Q.   Why didn't you go to Roger Coronado's expulsion hearing?

11   A.   There was no need to.

12   Q.   Why not?

13   A.   Because the system is in place as it is, so we do not

14   have to have -- so this does not need to -- I'm not needed to

15   be there.

16   Q.   Okay.

17   A.   The only thing that's needed to be there is my testimony

18   on what I saw them do.  I'm not the one who decides to punish

19   him.

20   Q.   Once again, what did he do?  Describe it, please.

21           MR. RIORDAN:   Objection.  It's been asked and

22   answered.

23           THE COURT:   I think we've been over that,

24   Mr. Cooper.

25           MR. COOPER:   No further questions at this time,

Gavin - Cross

1    your Honor.

2              THE COURT:   Any clarification testimony?

3              MR. RIORDAN:   A couple, your Honor.

4                        CROSS EXAMINATION

5    BY MR. RIORDAN:

6    Q.   Mr. Gavin, did Roger Coronado, the incident in question,

7    did he at any time in your presence back away from, distance

8    himself from this incident that was brewing?

9    A.   No.

10   Q.   In fact, he was someone that you witnessed come to the

11   incident and lend support to what you determined to be the

12   Latin -- I'm sorry, the Hispanic side of this altercation?

13   A.   That's correct.

14   Q.   That's something you witnessed with your own eyes?

15   A.   That's correct.

16   Q.   That's something that you wrote down in your report,

17   which is Plaintiff's Exhibit 3?

18   A.   That is correct.

19   Q.   Can you briefly tell me from a security guard's

20   standpoint the trouble or the risk that's involved when

21   others, the true instigating parties, let's say, when they

22   join in this type of activity?

23   A.   What occurs usually is we have a few students in a

24   verbal altercation, then their -- the people that they're

25   friends or associated with, they come and join them and it

Gavin   Cross

1  other?

2         THE WITNESS:  That is correct, your Honor.

3         THE COURT:  And they basically were divided into

4  groups by skin color, is that right?

5         THE WITNESS:  That's correct, your Honor.

6         THE COURT:  One group was predominantly black and

7  the other were lighter skinned apparently or Hispanic, is

8  that right?

9         THE WITNESS:  Correct, your Honor.

10        THE COURT:  Can you tell me a total, how many young

11  men were involved in this confrontation at the time it

12  reached its maximum?

13        THE WITNESS:  From the referrals that I wrote, your

14  Honor, I believe it was, including both parties, 13 to 15

15  students.

16        THE COURT:  A total of 13 to 15?

17        THE WITNESS:  Correct, your Honor.

18        THE COURT:  All right.  Was that roughly about the

19  same number on either side?

20        THE WITNESS:  It was very close to be, yes, your

21  Honor.

22        THE COURT:  All right.  Does anybody have any

23  further questions?

24        How close were the young men from each group to

25  each other?

1   individual involved in the fight that was not yelling

2   obscenities.

3                THE COURT:  Anything further?

4                MR. COOPER:  No, your Honor.

5                THE COURT:  You may step down.

6         (Witness excused.)

7                MR. COOPER:  Mr. Hampton?

8        ALAN KEITH HAMPTON, PLAINTIFF'S WITNESS, DULY SWORN

9                      DIRECT EXAMINATION

10   BY MR. COOPER:

11   Q.  Please state your name for the record.

12   A.  Alan Keith Hampton.

13               THE COURT:  I missed that.

14               THE WITNESS:  Alan K. Hampton, H-A-M-P-T-O-N.

15   BY MR COOPER:

16   Q.  Are you employed by the Village of Bolingbrook?

17   A.  Yes I am.

18   Q.  As?

19   A.  A police officer.

20   Q.  For how many years, sir?

21   A.  Approximately three-and-a-half.

22   Q.  Is this your first law enforcement job?

23   A.  No, it's not.

24   Q.  Where did you work prior, sir?

25   A.  Department of Corrections, Cook County.

1    Q.   What did you do on February the 7th, 2008, sir?

2    A.   I reported to work.

3    Q.   To where, sir?

4    A.   Bolingbrook High School.

5    Q.   What did you do when you arrived, sir?

6    A.   My normal routine is I check my e-mails and messages for

7    the day.

8    Q.   What did you do after that?

9    A.   I do not recall.

10   Q.   At some point did you interact with Roger Coronado?

11   A.   I believe I did.

12   Q.   What happened?

13   A.   From what I recall, he was called to the office and he

14   spoke with the dean.

15   Q.   Where?

16   A.   In the police liaison office at Bolingbrook High School.

17   Q.   How did he get to the police liaison office?

18   A.   I have no idea.

19             THE COURT:   You say he spoke with the dean at that

20   office?

21             THE WITNESS:   Yes, sir.

22   BY MR. COOPER:

23   Q.   The dean was in the office?

24   A.   Yes, sir.

25   Q.   Which one?

1    A.   He's not here.

2    Q.   What is his name?

3    A.   I believe it was Dean Detman.

4    Q.   What did Dean Detman say?

5    A.   I have no idea what he said.

6    Q.   Well, how do you know he spoke to Roger Coronado?

7    A.   Because I was in the office and he had a conversation

8    with Roger Coronado.  I did not hear what transpired between

9    the two.

10   Q.   Did you have a conversation with Roger Coronado, Jr.?

11   A.   Yes, I did.

12   Q.   What did you talk about?

13   A.   The citation that he was receiving from the Bolingbrook

14   Police Department.

15   Q.   What citation?

16   A.   It was a non-arrest citation for disorderly conduct.

17   Q.   Why was he receiving a disorderly conduct summons?

18   A.   Represented on information that was given to me from

19   security referenced his actions in the cafeteria.

20   Q.   And there was probable cause?

21   A.   I'm sorry?

22   Q.   There was probable cause?

23   A.   Yes.

24   Q.   For what?

25   A.   To receive the citation.

1    Q.    What did he do?

2    A.    According to the sheet, he joined in with a group of

3    subjects that was involved in a verbal altercation.

4    Q.    What sheet?

5    A.    His -- the written statement that he had -- by the time

6    he had written a written statement.

7    Q.    He had written a written statement?

8    A.    He wrote a written statement, yes.  And based on what

9    was --

10    Q.    Do you see his statement in the pile of papers?

11          Do you want to look through the pile of papers?

12    A.    This right here?  (Indicating.)

13    Q.    Sure.

14          MR. RIORDAN:  Exhibit 3?

15          THE WITNESS:  He said the pile of papers --

16          THE COURT:  Why don't you let him examine the

17    witness?

18          Why don't you show him what it is you want.

19    BY MR COOPER:

20    Q.    Handing you Plaintiff's Exhibit No. 3, it has two pages.

21    Can you see what you say you were given?

22    A.    Yes.

23    Q.    Describe it.

24    A.    It is a Valleyview Public School District written

25    statement, student statement.

1    Q.    What does it say?

2    A.    You want me to read what is written in the statement?

3    Q.    Please.

4    A.    It says, I just got up to try to see if my friends were

5    going to need help or something because they were -- a lot of

6    them, other guys on their side, so I got up to help.  And

7    it's signed.

8    Q.    And you're saying that that was handed to you?

9    A.    Yes.

10   Q.    What did you do with it?

11   A.    I read it and handed it back to the dean.

12   Q.    Then what did you do?

13   A.    By that time Roger was in the office.

14   Q.    Then what did you do?

15   A.    After he was finished with the dean, I spoke to Roger.

16   Q.    What did you say to Roger?

17   A.    I informed him that he would be receiving a citation for

18   disorderly conduct and that I explained the citation to him.

19   Q.    Did you do anything else?

20   A.    No, I did not.

21   Q.    Was there anyone else there?

22   A.    Yes, there was.

23   Q.    Who?

24   A.    Dean Detman and another officer from the Bolingbrook

25   Police Department.

1    Q.    How about a student?

2    A.    I do not recall.

3    Q.    Michael Clinton?

4    A.    I don't recall.

5    Q.    Another policeman?

6    A.    Yes, sir.

7    Q.    What was his name?

8    A.    Officer --

9              THE COURT:  Will you slow down just a little bit?

10             Go ahead.

11             THE WITNESS:  Can you repeat the question?

12    BY MR COOPER:

13    Q.    His name, the officer's name?

14    A.    Officer Ivlow.

15    Q.    How do you spell that?

16    A.    I-V-L-O-W.

17    Q.    Did you talk to anyone else?

18    A.    Throughout the day or -- can you please elaborate?

19    Q.    Not necessary.

20             MR. COOPER:  No further questions at this time.

21             MR. RIORDAN:  I have no questions for this witness.

22             THE COURT:  Hold on for a second.

23         (Discussion had off the record.)

24             THE COURT:  You may step down.

25         (Witness excused.)

1      THE COURT:  Call your next witness, Mr. Cooper.

2         MR. COOPER:  Roger Coronado, Jr.

3   ROGER CORONADO, JR., CALLED IN HIS OWN BEHALF, DULY SWORN

4         THE COURT:  You may inquire, Mr. Cooper.

5                    DIRECT EXAMINATION

6   BY MR. COOPER:

7   Q.   Roger, what happened on February the 4th, 2008?

8   A.   You say the 7th?

9   Q.   Give me the 4th.

10  A.   I went to school, went to my first period class, and

11  like I always do my routine, go to first period and --

12         THE COURT:  A little louder please, Mr. Coronado.

13  BY THE WITNESS:

14  A.   And when I got out of first period class, I went -- I

15  was sitting down in my chair and about maybe 8:00 o'clock,

16  8:10 security come for me and tells me they want me in the

17  school police station.  So --

18  BY MR. COOPER:

19  Q.   Roger, I want you to go back to February 4th.  I want

20  you to relax.  I want you to go back to the day you were in

21  the cafeteria.

22  A.   I was in the cafeteria grabbing my lunch, sat down, and

23  some boys that I seen in school came and sat at my table

24  because they were ditching class, so they come sit with me.

25  And we were just eating lunch, talking -- they were just

1   right there talking and security comes over here and tells

2   us, can I see IDs because there were too many at that table.

3   Q.   Roger, do you see that security guard here in the

4   courtroom?

5   A.   Yes, I do.

6   Q.   Do you know his name?

7   A.   I believe it's Gavin.

8   Q.   Where is he sitting?

9   A.   Back there. (Indicating.)

10   Q.   Continue, please.

11   A.   And he asked me for my ID, so I showed him my ID because

12   I know I wasn't ditching class.

13          So I show him my ID, he wrote my name down on a

14   piece of paper, I said is that okay, and he was checking

15   everybody else's names and he left. And maybe like five,

16   ten minutes later this black male came and just started

17   walking back and forth at our table where I was sitting, and

18   then he just kept looking at us really mad, so he left.

19          And then he came again but with a lot of his

20   friends, and they started saying stuff to one of the boys

21   that was sitting at my table. So that boy got up and went

22   like more away from the table, and they were saying -- they

23   were saying stuff to each other.

24          So then that's when the other boys from the -- the

25   guys from my table where I was sitting, they got up, too, and

1   I got up, too, just like I said, and they just started

2   arguing, saying stuff to each other.  And that's when

3   security came.  And I think -- I remember a lady security

4   came and got in the middle and said, like, break it up, guys.

5   And after that the bell rings, so I went to my next period

6   class.

7            But when I was going to my next period class I

8   heard Gavin tell -- the lady told Gavin, aren't you going to

9   write their names down?  And I heard Gavin said, for what?

10  We already got their names when we were checking their IDs,

11  so we'll just turn those names in.  That's what I heard,

12  because he was right by the door where I was --

13           MR. RIORDAN:  Can you speak up, please?  I just

14  can't hear him.

15           THE COURT:  Keep your voice up please, Mr.

16  Coronado.

17  BY MR COOPER:

18  Q.   Do you know anyone at the table?

19  A.   No.  I just seen them in school, around.

20  Q.   When did you become a student at Bolingbrook High

21  School?

22  A.   This year.

23  Q.   What happened on February the 7th?

24  A.   The 7th I went to school, went to my first period class,

25  and security came for me and said I got to go to the school

1   police station. And he escorted me there, and when I got

2   there Officer Hampton told me, Roger Coronado, have a seat.

3   So I took a seat. And then after that they had paperwork and

4   they took me to a back --

5   Q.   Stop for a second. I want you to describe what happens

6   when you walk in, and be very specific.

7   A.   Looks like they are mad, like they're --

8   Q.   Who is they?

9   A.   The officer. He looked like he was angry, like in a bad

10   mood, shouting, saying, let's go over here, we're going to

11   call your dad. So I'm like, okay.

12          So I give him my dad's -- my mom's number first.

13   But my mom, she told him call my dad because he's the one --

14   Q.   Excuse me, Roger. Who called who?

15   A.   The officer called my mom.

16   Q.   Officer Hampton made a phone call?

17   A.   To my mom, yes.

18   Q.   What happened?

19   A.   Then my mom told him, can you please call his dad

20   because he's the one that knows more English, understands a

21   little bit more than her. So we called my dad -- the officer

22   called my dad --

23   Q.   The officer called your dad?

24   A.   Yes -- and started to explain whatever happened. But my

25   dad was confused because he didn't know what he was talking

1   about because my dad's -- English is his second language so

2   he doesn't know that good. So my dad asked if he could talk

3   to a principal or somebody that speaks Spanish or something,

4   and the officer said, well, you can talk to your son; he's

5   the one that got into this, so he can explain what happened.

6          So he passed the phone to me and I started to

7   explain to my dad. And I was trying to explain since -- what

8   happened since the 4th. And he's like, no, tell him what I'm

9   going to tell you. So I was like, okay. So I told him

10  things like -- tell him you're going to be suspended for ten

11  days and you can have a $50 fine, ticket.

12  Q.   Roger, did you try to explain to your dad what happened?

13  A.   Yes, but I couldn't.

14  Q.   Why couldn't you explain to your dad what happened?

15  A.   He wanted me to tell him what he was going to tell me to

16  tell him.

17  Q.   He's here in the courtroom now?

18  A.   Yes.

19  Q.   Is he bigger than you?

20  A.   Yeah.

21  Q.   So continue, Roger.

22  A.   And after that I was talking to my dad, and when I was

23  right about to tell him to pick me up -- because his car

24  wouldn't turn on, so I had to wait a little bit longer. And

25  when I was still talking to my dad, he hands me this sheet

1  right here --

2  Q.  Who handed you?

3  A.  Officer Hampton handed me this sheet and tells me to --

4  Q.  What is that sheet?

5         MR. COOPER:  Let the record reflect that Roger

6  Coronado is referring to Plaintiff's Exhibit No. 3.  And for

7  the record, Roger Coronado is a 15-year-old boy.

8  BY THE WITNESS:

9  A.  And he tells me to -- because I was still talking to my

10  dad, so when he handed me the clipboard, he was like, sign

11  right here, but I was still like talking to my dad.  So I was

12  like, okay, because I -- like I didn't know what it said on

13  top.  So I just signed it.  And he left and then, I guess,

14  turned it in.

15  BY MR. COOPER:

16  Q.  Did Officer Hampton describe the sheet of paper for you?

17  A.  Not that I remember, no.

18  Q.  Did you know what you were signing?

19  A.  No.

20  Q.  Why not?

21  A.  Because I was talking to my dad at that moment.  I had

22  two things, so I didn't know --

23  Q.  Did he show you the sheet of paper?

24  A.  No.  He just says sign.

25  Q.  Was the sheet of paper covered?

1   A.   Yes.

2   Q.   With what?

3   A.   Paper in his hand.

4            THE COURT:  With what?

5            THE WITNESS:  With a paper over in his hand.

6   BY MR COOPER:

7   Q.   Was it on a clipboard?

8   A.   Yes.

9   Q.   Why did you sign it?

10  A.   Because I was telling him before I got there, I was

11  saying why am I getting charges for this?  He was like, don't

12  act stupid, you know what you did.  He's like, you were

13  posturing with your friends and were going to get in a fight.

14  And I was like -- so I didn't know -- I was surprised because

15  this is the first time it happened to me.

16  Q.   Then what happened?

17  A.   So then he left, and I guess another boy that was

18  sitting on the other side, sitting in the chair, so the boy

19  was arguing with him, Officer Hampton, saying that he wasn't

20  involved that day, that he didn't want to sign the sheet.

21  And he was like, I was sick that day, and the officer said,

22  you think you're tougher than me, and the kid is like, no,

23  sir.  So he slammed the door and the kid like kind of moved

24  like --

25  Q.   How did he slam the door?

1  A.  Like -- the chair was right there and the door was next
2  to it.
3  Q.  What did he strike with the door?
4  A.  What?
5  Q.  What struck the door?
6  A.  The kid's chair.
7  Q.  What happened?  How did you feel at that point?
8  A.  So about that point I was barely going to sit down, so I
9  got scared because I'm like -- I didn't know if I was going
10  to get arrested or hit or -- I don't know.
11  Q.  What did Officer Hampton do next?
12  A.  He hand me a summary.
13  Q.  You can hold the exhibit up.
14      What piece of paper did he hand you next?
15  A.  This one.  (Indicating.)
16  Q.  What is it?
17  A.  It's Valleyview Community Summary.
18  Q.  Is your handwriting on it?
19  A.  Yeah.
20  Q.  So it's Page 2 of Exhibit 3.
21      How did your handwriting get on that piece of
22  paper, Roger?
23  A.  Well, he write something of what happened the 4th --
24      THE COURT:  Hold it a second.
25      You have handed me something, Mr. Cooper, that says

1   Plaintiff's Exhibit 3 --

2          MR. COOPER:  Page 2, your Honor, the second page.

3   The Yellow Page is --

4          THE COURT:  You have handed me something that says

5   Plaintiff's Exhibit 3.  The first page says 1 of 2, the

6   second page says one of 2.

7          MR. COOPER:  Your Honor, it should be 2 of 2.

8          THE COURT:  Well, which is the second page, the one

9   with the B on the bottom?

10          MR. COOPER:  Yes, your Honor.

11          THE COURT:  That should be 2 of 2?

12          MR. COOPER:  Yes, your Honor.  I apologize.

13   BY MR. COOPER:

14   Q.   Roger, how did your handwriting get on the second page?

15   A.   Like I said again, I asked him why, for why if I didn't

16   do anything.  And again he told me I know what I did.  So I

17   just grabbed a pen -- he hand me a pencil.  I just started

18   writing what happened, and at that moment I was --

19   Q.   Read the first few lines before you get to the word try?

20   A.   I just get up and try --

21   Q.   Stop right there.

22          Is there a capital T?

23   A.   Yeah.

24   Q.   Why is there a capital T?

25   A.   At that moment, that's when I asked him to see what was

1   I doing and he told me I knew what I did.

2   Q.   So you asked him what to write?

3   A.   Yes.

4   Q.   What did he tell you to write?

5   A.   That I got up and started supporting my friends that

6   were at the table and I was going to get in a fight.

7   Q.   Roger, why would you write a confession?

8   A.   They handed it to me.

9   Q.   What did you think was going to happen if you didn't do

10  it?

11  A.   Probably get hit or get slammed by the door or arrested

12  or -- I don't know what would happen on that day.

13  Q.   Roger, are your parents' names on that sheet of paper?

14  A.   Yeah, they are, on the bottom.

15  Q.   Were your parents there when that sheet of paper -- when

16  you received it?

17  A.   When I was about to fill this out?

18  Q.   Yes?

19  A.   No.

20  Q.   Was it blank?

21  A.   Yeah.

22  Q.   And you are aware that Officer Hampton said that he

23  didn't do anything else, he didn't call your parents?

24  A.   Uh-huh.

25  Q.   But he did call your parents?

1   A.   Yeah, he did, my dad and my -- my dad and --

2   Q.   Dean Detman there?

3   A.   Like, I never been to the dean's office. I'm not sure

4   who is my dean, so I wouldn't --

5   Q.   Who else was in the room?

6   A.   I remember a few guys but -- I guess the security

7   because they had walkie-talkies and everything, and there was

8   another officer dealing with another kid.  So --

9   Q.   What happened on February the 19th?

10  A.   That day we went to a hearing and -- we got to school

11  and we went to his office, I guess -- I'm not sure what it's

12  called, and we were waiting until we were going to sit down.

13  And when they called us to the room, this lady comes and

14  stops us halfway when we were walking to the door and tells

15  us, this envelope is for you. We're sorry we forgot to send

16  it to you but here it is now.

17        So my dad didn't know what it was, so he just put

18  it in his pocket because we were right at the moment to go

19  into the meeting.

20        So as soon as we walk in the meeting --

21        MR. RIORDAN:  Your Honor, he's showing the

22  documents.  I want to make sure I know what he's talking

23  about that his parents got that day.

24        Are you referring to what you have in your hand

25  right now?

1   BY THE WITNESS:

2   A.   The one that --

3   BY MR COOPER:

4   Q.   Are you referring to the notification of the hearing?

5   A.   Yeah, the one that came in the envelope.

6        MR. RIORDAN:  So I'm certain what they are talking

7   about, you're saying that you showed up to the hearing

8   without getting notification?

9        THE COURT:  Hold it a second, Counsel.  Talk to me.

10  Do you have an objection or do you want to --

11       MR. RIORDAN:  I'm sorry, your Honor.

12       Well, I would like some clarification of the

13  document that they're talking about that the parents received

14  as they walked in.  He was showing him the documents in his

15  hand.  I don't know if he was referring to those or something

16  else.

17       THE COURT:  All right.  Your client has just

18  testified that his parents walked into the hearing, they were

19  handed a piece of paper and a lady said to them, this is for

20  you, we forgot to send this to you.  Is that his testimony?

21       MR. RIORDAN:  Is that your client's testimony?

22       MR. COOPER:  Yes.

23       MR. RIORDAN:  I'm sorry.

24       THE COURT:  Okay.  What was it that was handed to

25  you?

1        THE WITNESS:  It was an envelope and it was the

2    same sheet we got through the mail but it was, again, in an

3    envelope.

4        THE COURT:  It was a sheet you got through the

5    mail?

6        THE WITNESS:  It was -- yeah.

7        THE COURT:  But didn't the lady say they forgot to

8    mail it to you?

9        THE WITNESS:  Yes.

10        It was an envelope and there was a sheet that said

11    Pablo Coronado -- that's what it was in there.  They said I

12    could have brought witnesses and that I have the hearing -- I

13    had a hearing that day.  And I got that one the same day of

14    the hearing.

15    BY MR COOPER:

16    Q.   What happened then?

17    A.   So we walked in and Mr. --

18    Q.   Did you see anyone when you walked in, anyone who is

19    here today?

20    A.   Yes.

21    Q.   Who?

22    A.   I'm not sure what's his name but --

23    Q.   The person who testified earlier?

24    A.   Yes.  The hearing officer I think.

25    Q.   What was he wearing?

1    A.   Brown, gray, with a white shirt.

2    Q.   What happened?

3    A.   So we walked in and he said good morning, shook my

4    parents' hands and me.  And my dad asked if we could have an

5    interpreter because with these cases that are pretty big, he

6    wants to really be specific of what they tell him.  But the

7    hearing officer said, I don't think that's necessary, and if

8    not, if we have a problem, your son is here.

9            So we said okay.  So we sat down on the table and

10   --

11           THE COURT:  Mr. Prodehl said that?

12           THE WITNESS:  Yes.

13   BY MR. COOPER:

14   Q.   Was anything given to your parents to sign?

15   A.   Yes.  When my dad asked as to that, he handed us this

16   one right here, the --

17   Q.   This is after your father asked for an interpreter?

18   A.   Yes.

19           The statement right here, he asked them, could you

20   guys please sign this.  And like I said, my dad -- my parents

21   don't know that much English, so they thought it was -- they

22   were present at the hearing -- that they didn't miss the

23   hearing.  So my dad signed it and my mom signed it.  And then

24   --

25   Q.   Did you see --

1       THE COURT:  Hold it.  Stop.

2            When he said let's sign this, what do you have in

3   your hand there?

4       THE WITNESS:  This one right here.  (Indicating.)

5       THE COURT:  Okay.  And that's Plaintiff's Exhibit

6   3, Page 2 of 2, with the Exhibit D designation at the bottom.

7            Okay.  You may proceed.

8   BY MR COOPER:

9   Q.   Roger, please look at Exhibit 3, Page 2.  Do you see any

10  writing above your parents' names?

11  A.   Yes.  This is, have seen the statement.

12  Q.   Was that writing on the piece of paper when your mother

13  and father signed it?

14  A.   That I was aware, no.

15  Q.   Continue, Roger.

16  A.   All right.  So after that, my parents signed this, the

17  hearing officer said, could you please have a seat.  So we

18  took a seat and he started to explain -- he told me, can you

19  explain to me what happened, in your own words of what

20  happened on the 4th.

21           So I started to explain to him, and I was -- I went

22  to lunch and -- the same thing I was saying again, that we

23  were getting into an argument and everything.  So he was

24  like, okay.

25           So he was telling me what the -- I guess what Gavin

1  wrote as his complaint on the referral, and he read that.

2  And he was telling me that if I hang around with pigs, I'll

3  be full of mud.

4  Q.  Who said that?

5  A.  The hearing officer.

6         And then he told me, we have some comments about

7  your teachers.  And he said, you're a respectful student,

8  you're not a -- have behavior problems in classes or

9  anything.  And I said, okay, so that's good.

10        And my dad told him that I was in sports and I play

11  for the Bolingbrook community.

12        MR. COOPER:  One second, Roger.

13     (Brief pause.)

14  BY MR. COOPER:

15  Q.  Roger, handing you a document marked as Exhibit No. 9,

16  what is it?

17  A.  It's my last year on the baseball team.

18  Q.  Do you play a lot of baseball?

19  A.  Since -- t-ball -- I was six.

20  Q.  Are you a member of a gang?

21  A.  No.

22  Q.  Are you of Mexican descent?

23  A.  Yes, Mexican.  Oh, I'm an American citizen but my --

24  second is Mexican.

25  Q.  Were any of your friends sitting at that lunch table?

1    A.    No, they are not my friends.  They are just people that

2    I seen in school and -- I seen them in the hallways.

3    Q.    Roger, what do you want to be when you grow up?

4    A.    I want to go to college and become a lawyer, if I can,

5    if I -- yeah, that's my dream, I want to become a lawyer.

6                  MR. COOPER:  No further questions at this time.

7                  THE COURT:  Any cross?

8                         CROSS EXAMINATION

9    BY MR. RIORDAN:

10   Q.    Roger, my name is Brian Riordan.  I represent the school

11   district.  We haven't been introduced before, so I thought I

12   would introduce myself.

13            Let me make sure I understand your testimony

14   correctly.  Is it your testimony that when this altercation

15   took place in the cafeteria during your scheduled lunch hour,

16   you got up from your chair at the table and distanced

17   yourself from the altercation?

18   A.    Yeah.  I walked away from it.

19   Q.    So it's your testimony that you did not join in and lend

20   support to other people sitting at your table?

21   A.    Because the fight was fought over there and I was all

22   the way in the back.  So I wasn't in the front where all the

23   action was going to happen.

24   Q.    Okay.  It's a very specific question.

25            Did you lend yourself support to the fight and join