1    in or did you back away and get yourself away from where the

2    fight was taking place?

3    A.   No, I didn't join.

4    Q.   You got yourself away from there?

5    A.   Yeah.

6    Q.   Okay.  Please take a look at -- do you see the exhibit

7    book that's up there, the black book?

8            MR. COOPER:  He doesn't have it.  It's 15.

9            MR. RIORDAN:  There's been one up there through all

10   the testimony.

11           MR. COOPER:  I stand corrected.

12   BY MR. RIORDAN:

13   Q.   If you could take a look at Exhibit No. 2.  I'm trying

14   to make sure I understand your testimony.

15           THE COURT:  That's Defendants' Exhibit 2?

16           MR. RIORDAN:  Defendants' Exhibit 2, yes.  It is a

17   letter dated February 11, with a Certified Mail attachment to

18   the -- behind it.

19   BY MR. RIORDAN:

20   Q.   Is it your testimony that this was the letter that was

21   handed to you directly before the hearing?

22   A.   Yes, sir.

23   Q.   I think I also understood your testimony that you did

24   receive this previously in the mail?

25   A.   Yes.  We got two more of these.  But it said Pablo, so

1    --

2    Q.    Do you see where else it says Mr. Regilio Coronado?

3    A.    Uh-huh.

4    Q.    Okay.  You see on the second page where there's actually

5    a signature for acceptance of this letter?

6                    MR. COOPER:  Objection, your Honor.

7                    THE COURT:  What is the basis of your objection?

8                    MR. COOPER:  Your Honor, Mr. Coronado, Jr., cannot

9    speak for his father's actions.  It would be hearsay, your

10   Honor.

11                   MR. RIORDAN:  I haven't asked him any specific

12   question about what is or is not on this paper.  I'm asking

13   him just to look and see if he sees this particular piece of

14   paper.

15                   THE COURT:  Overruled.

16                   MR. RIORDAN:  Thank you.

17   BY MR. RIORDAN:

18   Q.    Do you see that signature page, Page 2 to this exhibit?

19   A.    Yes.

20   Q.    Do you see Mr. -- under the left-hand side it says --

21                   MR. COOPER:  Objection, your Honor.

22                   THE COURT:  Slow down.  Let him complete the

23   question.

24   BY MR. RIORDAN:

25   Q.    Do you see on the left-hand side where it's typed out

1   Mr. Regilio Coronado?

2              THE COURT:  Okay.  What's the basis of your

3   objection?

4              MR. COOPER:  He's referring to a Certified Mail

5   receipt.  He's a 15-year-old boy.  He would not have any --

6   the post office wouldn't even give him a Certified Mail

7   receipt.

8              THE COURT:  Overruled.

9              MR. RIORDAN:  Thank you.

10  BY MR. RIORDAN:

11  Q.  Do you see that, where it lists your father's name?

12  A.  Yes.

13  Q.  Is that your address, 213 Bedford, Bolingbrook,

14  Illinois?

15  A.  Yes.

16  Q.  Do you recognize your father's signature?  You see him

17  sign anything in the past?

18  A.  Like what kind?

19  Q.  You've never had to have your father sign a --

20             THE COURT:  You just told us you saw your dad sign

21  a piece of paper at the hearing.

22             THE WITNESS:  Yes.

23  BY MR. RIORDAN:

24  Q.  So I'll ask you again:  Have you had occasion to see

25  your father's signature in the past?

1   A.   Yes.

2   Q.   Okay.   Does this look like your father's signature on

3   here?

4   A.   On the second sheet?

5   Q.   On the second sheet.

6   A.   Yes.

7   Q.   Okay.   So in this letter -- did you read this letter

8   when it came in the mail?

9   A.   Yes.

10  Q.   Okay.   And it asks you to bring forward anything at the

11  hearing that will be -- that will help you at the hearing?

12  A.   Yes.

13           And my dad called the same day --

14  Q.   I'm asking you a certain question.   Did you --

15           THE COURT:   Let him complete his answer.

16  BY MR. RIORDAN:

17  Q.   Sorry.   Go ahead.

18  A.   My dad called the hearing officer so he could have

19  information and a translator so he can tell him about those

20  questions that he wanted, if he could have evidence of what

21  was this about.   But he left a voicemail and nobody called

22  back, so --

23  Q.   Were you present when your father made this call to the

24  hearing officer's location?

25  A.   I was next to him.

1   Q.  Do you know if your father spoke Spanish or English when

2   he left that message?

3   A.  He left it in English.

4   Q.  Okay.  And you're saying that no one ever called him

5   back after that?

6   A.  Yes, sir.

7   Q.  Okay.  Did you bring anything with you to help in your

8   defense for these charges that were levied against you?

9   A.  Well, I didn't have nothing to defend myself, so what

10   could I have brought?

11   Q.  Did you ask any witnesses to attend on your behalf?

12   A.  No.

13   Q.  Okay.  You brought no documentary evidence that would

14   have showed that you were not there -- that you were not

15   present at the time that this occurrence took place?

16   A.  Ask the question again.

17   Q.  Sure.

18         You brought with you no documents that showed that

19   you were not involved in this incident at the hearing?

20   A.  I didn't have no documents.

21   Q.  Let's turn to Exhibit No. 3, Defense Exhibit No. 3.  I

22   was a little confused by your testimony on this document.

23         I would like to know -- my understanding is -- when

24   you wrote this document out.

25   A.  I wrote it on the same day I was going to get suspended.

1   It's on the 4th.

2   Q.   Okay.  And this is all in your handwriting?

3   A.   Yes.

4   Q.   Okay.  And what part of this written statement in

5   Exhibit 3 do you disagree with?

6          MR. COOPER:  Your Honor, if I may?  I'm not sure

7   what document he --

8          THE COURT:  Do you have an objection?

9          He's got Defendants' Exhibit 3.  Now, if there is

10  an objection, by all means make one.

11         MR. COOPER:  Your Honor, I am still confused.

12  There are documents with the date of the 7th, and then there

13  are --

14         THE COURT:  You may answer the question.  Listen to

15  the question read back.

16     (Record read.)

17  BY THE WITNESS:

18  A.   Where it says try to see if my friends were going to

19  need help or something because they were in a lot of -- on

20  the -- the other guys on the other side, so I got up, too.

21  BY MR. RIORDAN:

22  Q.   So you disagree with that part of the statement?

23         Why did you write it?

24  A.   Because, like I said, I told the officer why am I

25  getting accused for this.  He's like, because you were trying

1    to help your friends that were in a large group that were

2    going to get in a fight.

3    Q.   So it's your testimony that you were threatened by the

4    officer to make this statement?

5    A.   At that moment, yeah, because he was like angry and

6    shouting, so I didn't know -- I was nervous, so I didn't know

7    what could happen to me at that moment.

8    Q.   You were present when your parents were shown this

9    statement at the hearing?

10   A.   Yes.

11   Q.   You see that they signed the statement as well, that

12   they looked at it?

13   A.   Like I said, they didn't read the statement.  All they

14   did was just sign.

15   Q.   Let's turn your attention to Exhibit 4 in that same

16   booklet.  It's the Office of the Dean, Student Referral Form.

17           THE COURT:  Where are you at?

18           MR. RIORDAN:  Exhibit No. 4, Defense Exhibit No. 4

19   in the booklet.

20   BY MR. RIORDAN:

21   Q.   Do you see that?

22   A.   Yes.

23   Q.   That's your signature there in the middle of the page?

24   A.   Yes.

25   Q.   Do you see the section right above that that says that

1   your signature shall not be taken as an admission of the

2   offense?

3   A.   Yes.

4   Q.   So you were signing that not admitting to what was

5   written on the form, correct?

6          MR. COOPER:   Objection, your Honor.   It's been

7   asked and answered.

8          THE COURT:   I don't think so.

9          MR. COOPER:   Your Honor, he testified that the

10   officer covered the document.

11          THE COURT:   This question has not been asked.

12          MR. RIORDAN:   It wasn't asked by me, certainly.

13   BY MR. RIORDAN:

14   Q.   What portion of the recitation of the incident that's

15   listed above your signature do you disagree with?

16   A.   What do you mean?

17   Q.   If you could take a look at what's written there above

18   your signature, it says -- starting with, Roger was seen by

19   myself?

20   A.   Uh-huh.

21   Q.   You've had a chance to review that?

22   A.   Yes.

23   Q.   Okay.   What part of that statement that's written there,

24   as we heard earlier written by Mr. Gavin, do you disagree

25   with?

1    A.    Flashing gang signs and that -- yeah, flashing gang
2    signs and posturing with a large group in the cafeteria.
3    Q.    Okay.  So the first statement that you wrote out was
4    because you were under pressure from Officer Hampton, is that
5    correct?
6    A.    Yes.
7    Q.    And the second one is just a flat-out lie by Mr. Gavin,
8    is that correct?
9    A.    Yes.
10   Q.    Okay.
11         Now let's go to the hearing.  You're present at the
12   hearing with your parents, correct?
13   A.    Yes.
14   Q.    Mr. Prodehl is there as well?
15   A.    Yes.
16   Q.    Okay.  What was the impetus to you telling Mr. Prodehl
17   that you admitted to your conduct on the day of February 4th,
18   2007?
19   A.    I told him that -- because my parents wanted to make
20   sure I was the one who flashed gang signs and Mr. -- the
21   hearing officer said that was not true, I didn't do any
22   flashing gang signs.
23   Q.    That's not exactly my question.
24         I understand that it's your testimony that at the
25   hearing you said you were not flashing gang signs, is that

1   correct?

2   A.   Yes.

3   Q.   But also at the hearing it indicates -- and why don't

4   you look at that, Exhibit No. 6.  The second page of Exhibit

5   No. 6 is a summary of the testimony that was given at the

6   hearing, under Section 12.

7          You can take a look and read through that as well

8   as remembering the testimony of the hearing officer, Prodehl.

9   A.   What number is that?

10  Q.   I'm sorry?

11  A.   What number is that?

12  Q.   It's Roman Numeral xii, the bottom of Page 2.

13  A.   As in -- in the referral sheet?

14  Q.   Exhibit No. 6, look after -- the one that's identified

15  as Exhibit No. 6 in the booklet, and then flip to the second

16  page, towards the bottom of the second page.

17  A.   I don't know where that is.

18          MR. RIORDAN:  Can I approach the witness, your

19  Honor, and help him with it?

20          THE COURT:  Sure.

21          MR. RIORDAN:  Thank you.

22      (Brief pause.)

23  BY THE WITNESS:

24  A.   What was the question?

25  BY MR. RIORDAN:

1  Q.  Have you had a chance to review that?  You have had a

2  chance to review it?

3  A.  Yes.

4  Q.  Okay.  Approximately seven lines down there's a sentence

5  that starts at the very end of that line -- it starts Roger.

6  Could you read that into the record, please?

7  A.  Where it says Roger --

8  Q.  Roger stated.

9  A.  -- stated he did not belong in any gang.

10  Q.  I'm actually talking about two lines up from that.

11  We'll get to that in a second.

12       It's Roger stated that he did walk?

13  A.  Okay.  Roger stated that he did not -- did not --

14       MR. RIORDAN:  May I approach again, your Honor, and

15  show him what I'm talking about?

16       THE COURT:  Yes.

17  BY THE WITNESS:

18  A.  There's two, so --

19       (Discussion had off the record.)

20  BY THE WITNESS:

21  A.  Oh, that he did walk over and lend support to his table,

22  some of whom he knows are Latin Kings.

23  BY MR. RIORDAN:

24  Q.  Okay.  The statement again, for the record:  Roger

25  stated that he did walk over and lend support to his table,

1   some of whom he knows are Latin Kings.

2          Do you disagree with that statement?

3   A.   Yes.

4   Q.   So during your testimony at the hearing in front of Mr.

5   Prodehl, you did not admit to walking over and lending

6   support to the fight that was about to occur?

7   A.   Yes.

8   Q.   Okay.  So now we have Officer Hampton, who was

9   intimidating you into making a statement; we have Security

10  Officer Gavin, who just completely made up and lied about a

11  statement; and then you have the officer -- the hearing

12  officer just making up and not accurately taking down your

13  statement?  Is that your testimony?

14  A.   Yes.

15  Q.   Okay.  What was the fear -- I'm sorry.  Strike that.

16         Was there any fear, was anyone intimidating you at

17  that hearing into what to say?

18  A.   No.

19  Q.   Okay.  What actually did you testify to at the hearing?

20  What was your version of how it happened on February 4th?

21  A.   Well, I told them that I was in my regular lunch period,

22  I went and sat down, got my lunch, sat at the table, and the

23  guys that were sitting at my table came and sit down at my

24  table.  And the same thing -- Security Gavin came in, told us

25  can he see IDs because there were too many at that table.

1   And it's usually empty, not that much, maybe five -- three or

2   four people.

3   Q.   Okay.  So all of these officers and school district

4   personnel are just trying to get you to be expelled.  Do you

5   have any idea why?

6   A.   I don't know why.  This is my first time, so --

7   Q.   Okay.  How are your grades, Mr. Coronado?

8   A.   How do I what?

9   Q.   How are your grades?

10  A.   My grades?  I'm gonna say maybe C, D student.

11  Q.   Have you seen your last report card?

12  A.   No, I have not.

13  Q.   Could you turn to Exhibit 7, please, Defense Exhibit 7

14  in the booklet.

15         MR. COOPER:  Objection, your Honor.

16  BY MR. RIORDAN:

17  Q.   Could you please look at that document, sir.

18         THE COURT:  What is the basis of the objection?

19         MR. COOPER:  His grades have absolutely nothing to

20  do with whether or not he was given due process at the

21  hearing.

22         THE COURT:  Isn't one of the factors I am to

23  consider is the severity of the punishment in light of the

24  child's overall history at the school?

25         MR. COOPER:  I would think history would have to do

1   with disciplinary action, not whether or not he's a C or D

2   student.

3              MR. RIORDAN:  Actually, your Honor, I would like to

4   respond to that.

5              There are three factors --

6              THE COURT:  Severity of the punishment, the

7   interest of the child, and then -- I misspoke -- the

8   likelihood that such conduct will -- wait.

9              Yes, the history or record of the student's past

10  conduct is one of the factors that I am to consider, aren't

11  I?

12             MR. RIORDAN:  I will tie it up with the

13  administration's officials, that three factors, including

14  absenteeism, very poor grades and then some sort of

15  disciplinary history, all factor into their --

16             THE COURT:  On that representation that you can tie

17  it up, I'll overrule the objection.

18             You can renew your objection if you believe the

19  relevancy isn't established.

20             MR. RIORDAN:  Thank you, your Honor.

21  BY MR. RIORDAN:

22  Q.   Have you had a chance to look at Exhibit No. 7?

23  A.   Yes.

24  Q.   Do you have any reason to doubt that the grades that are

25  reflected in Exhibit No. 7 are true and accurate?

1    A.    Say the question again.

2    Q.    Do you have any reason to believe that the grades that

3    are reflected here in Exhibit 7, that they are not accurate

4    in terms of what your real grades are?

5    A.    So you're meaning that these are my fake grades or they

6    are not real?

7    Q.    I'm asking you if you believe you have different grades

8    than are written here in Exhibit 7?

9    A.    These are just semester -- a semester one or the whole

10   year?

11   Q.    These actually are identified by each quarter in each

12   semester, per class.

13   A.    There's nothing wrong with them.  That's the right ones.

14   Q.    They look appropriate?  They look like the ones that you

15   received?

16   A.    Yeah.

17   Q.    If you would look to the second page of that same

18   exhibit, Defense Exhibit No. 7, about maybe -- in the second

19   bracketed section there's an indication on the right-hand

20   side the rank in your class.  It identifies you as rank 1,168

21   out of 1,299 in your class.  Does that appear to be accurate

22   to you?

23            MR. COOPER:  Objection, your Honor.

24            THE COURT:  Basis?

25            MR. COOPER:  He wouldn't know whether or not that's

1  an accurate record.

2           THE COURT:  Why don't we find out if he knows.

3  BY MR. RIORDAN:

4  Q.  Do you know what your rank in class is, sir?

5  A.  I never seen this sheet.

6  Q.  Do you have any reason to state here to the Court today

7  as to why this may not be accurate?

8           THE COURT:  Are you going to be able to put this in

9  by competent evidence?

10          MR. RIORDAN:  Absolutely, your Honor.

11          THE COURT:  Then we'll reserve hearing that

12  testimony until you establish that.

13          MR. RIORDAN:  Same thing about his G.P.A.?  I'll

14  wait until we --

15          THE COURT:  Yes.

16          MR. RIORDAN:  Okay.

17  BY MR. RIORDAN:

18  Q.  Approximately how many days on average are you absent

19  from school in any given week, sir?

20  A.  From school?

21  Q.  From school, absent from school.

22  A.  I remember -- I guess once or twice.

23  Q.  Only once or twice in the whole school year?

24  A.  Yeah.  Once because we forgot to call the school, but

25  that's the last I remember.

1  Q.  How many times are you cited with tardiness to school?

2  A.  I don't know.

3  Q.  Okay.  Sir, is it your testimony that you were unaware

4  that any of the students that you stood up behind were Latin

5  Kings?

6          MR. COOPER:  Objection, your Honor.  It's not what

7  the plaintiff testified to, your Honor.

8          THE COURT:  Overruled.

9  BY MR. RIORDAN:

10  Q.  Please answer the question.

11  A.  Could you ask the question again?

12          MR. RIORDAN:  Could you please read it back?

13      (Record read.)

14  BY THE WITNESS:

15  A.  Yes, I was unaware.

16  BY MR. RIORDAN:

17  Q.  I'm sorry?  You were aware that they were Latin Kings?

18  A.  I was unaware.

19          Like I said, they are boys that I seen in -- one of

20  my classes, but I don't talk to them like that.  They're not

21  my friends that I hang outside or nothing.  They're just boys

22  from school.

23  Q.  Do you on a regular basis wear the colors black and gold

24  to school?

25  A.  No.

1   Q.   Do you lift either one of your pant legs up during

2   school, during class?

3   A.   No.

4   Q.   Do you think there's anyone -- strike that.

5           During the time that you've been off on suspension,

6   have you been receiving home schooling?

7   A.   Yes.

8   Q.   Who is that through?

9   A.   My teacher, Mr. Cappetta.

10  Q.   And you were given the opportunity to go to a different

11  school called the Premier Academy in Joliet?

12  A.   Yes, but like that school is for --

13  Q.   Were you given that opportunity, sir?

14  A.   Yes.

15  Q.   Did you choose to go to that school to continue your

16  education?

17  A.   No, because that school is for kids that are not -- that

18  have out of control and don't have their behavior controlled.

19  And me, I'm not an unbehaviored kid.

20          MR. RIORDAN:  I have nothing further at this time,

21  your Honor.

22          THE COURT:  Do you have any more witnesses,

23  Mr. Cooper?

24          MR. COOPER:  A couple more questions, your Honor,

25  if I may.

1           THE COURT:  Is this your last witness?

2           MR. COOPER:  No, your Honor.

3           THE COURT:  Well, you're out of time -- or soon to

4   be.  You told me you had four witnesses.  This is your fourth

5   witness.

6           MR. COOPER:  Your Honor, I have Dr. Cappetta and

7   Mr. Coronado.

8           THE COURT:  I cautioned you about the time.  I

9   asked you how many witnesses you had and I thought you told

10  me you had four.

11          You can ask a few more questions here, but I'm

12  going to have to be fair to both sides.  I gave you an

13  afternoon for a preliminary hearing, which should be plenty

14  enough time, and I give the other side the same amount of

15  time.

16          So you can proceed.

17                      REDIRECT EXAMINATION

18  BY MR COOPER:

19  Q.   Did Mr. Coronado say anything to you about a ticket, or

20  to your parents?

21  A.   Yes.  My dad said, what can I do with -- if I get a

22  ticket, and the hearing officer said, oh, I recommend you

23  just to pay it and get it over with.

24  Q.   Have you ever met Mr. Detman?

25  A.   I don't know who that is.

1        MR. COOPER:  No further questions, your Honor.

2        THE COURT:  Anything further?

3        MR. RIORDAN:  No, your Honor.

4        THE COURT:  All right.

5        We'll take about a ten-minute break.  And I'll give

6    you another 20 minutes of testimony but that's it,

7    Mr. Cooper.

8        (Witness excused.)

9        THE COURT:  We'll stand in recess.

10        Likewise, the defense will have to be mindful of

11    their time.

12        MR. RIORDAN:  Yes, we will, your Honor.

13        (Brief recess was taken.)

14        MR. COOPER:  With the Court's permission, I would

15    like to call Dr. Cappetta to the stand.

16        THE COURT:  All right.

17        MR. COOPER:  I haven't discussed with opposing

18    counsel Dr. Cappetta's role, but Dr. Cappetta was mentioned

19    in --

20        THE COURT:  Counsel, you have two witnesses and

21    about 20 minutes.

22        MR. COOPER:  Thank you.

23        THE COURT:  Doctor, would you step up here, please.

24    ROBERT W. CAPPETTA, PLAINTIFF'S WITNESS, DULY SWORN

25        MR. COOPER:  For the record, I've had Roger

1    Coronado, Jr., leave the courtroom due to the sensitive

2    nature of the testimony that we're about to hear.

3                        DIRECT EXAMINATION

4    BY MR. COOPER:

5    Q.   Would you state your name for the record.

6    A.   My name is Robert W. Cappetta, C-A-P-P-E-T-T-A.

7    Q.   Please state your credentials.

8    A.   I am a professor of mathematics at the College of

9    DuPage, with a Ph.D. in mathematics education.

10   Q.   How is it that you know Roger Coronado, Jr.?

11   A.   I have been working with Roger on and off for the last

12   three years.  We first started working when his mother asked

13   for some help when he was having some difficulty in middle

14   school.

15            THE COURT:  You have been referred to as Dr.

16   Cappetta.  Do you have a Ph.D.?

17            THE WITNESS:  I do, yes, sir.  Ph.D. in mathematics

18   education.

19            THE COURT:  Okay.

20   BY MR COOPER:

21   Q.   Dr. Cappetta, there's a document in front of you marked

22   Plaintiff's Exhibit No. 3.  It should be in this pile right

23   here.  (Indicating.)

24   A.   No. 3, yes, sir.

25   Q.   Plaintiff's Exhibit No. 3, it has two pages.  The second

1    page is a confession by Roger Coronado, Jr.  Do you see that?

2    A.    Yes, I do.

3          MR. COOPER:  Your Honor, if I may, Dr. Cappetta is

4    a qualified witness when it comes to discussing Roger's

5    grades and his aptitude.

6    BY MR. COOPER:

7    Q.    Dr. Cappetta --

8          MR. RIORDAN:  Your Honor, I have no idea how that

9    has relevance to Exhibit No. 3 but --

10         THE COURT:  Ask a question, Mr. Cooper.

11   BY MR COOPER:

12   Q.    Dr. Cappetta, is there any reason why Roger Coronado,

13   Jr., would write a confession?

14         MR. RIORDAN:  Objection, your Honor.

15         THE COURT:  Sustained.

16   BY MR COOPER:

17   Q.    Dr. Cappetta, Roger Coronado did tell you what happened

18   on February 4th, February 7th and February 19th, is that

19   correct?

20         MR. RIORDAN:  Objection, your Honor.

21         THE COURT:  Sustained.

22   BY MR COOPER:

23   Q.    What has Roger Coronado told you about why we're here

24   today?

25         MR. RIORDAN:  I would object, your Honor.  This

 1    witness has absolutely no bearing on this proceeding

 2    whatsoever.  If he wants to talk about his grades for some

 3    reason or --

 4            THE COURT:  It relates to an out-of-court statement

 5    as well.

 6            MR. RIORDAN:  Exactly, your Honor.

 7            THE COURT:  Your objection is sustained.

 8            MR. RIORDAN:  Thank you, your Honor.

 9            MR. COOPER:  Your Honor, I am simply asking him

10    what he knows.

11            THE COURT:  No.  You're asking him what somebody

12    told him.  That sounds to me like you're inviting a hearsay

13    answer.

14    BY MR COOPER:

15    Q.   What do you know about Roger Coronado, that you know?

16    A.   Well, I know -- most about Roger I know about his

17    academics.  And I have been working with him for -- certainly

18    for the last four months continuously, and I think it's fair

19    for me to say that he has some awfully big difficulties when

20    it comes to learning, especially in mathematics.

21            When I first started working with him this year, he

22    did not have his addition facts, about three or four, he did

23    not have his multiplication tables down at all.  He had very

24    great difficulties with things that most students can master

25    in third and fourth grade.  So we've had to go quite a ways

1    back to kind of build up those skills to give him a chance to

2    be successful in the math course.

3            I was working with him on his -- preparing for his

4    final exam in pre-algebra, and from my perspective he never

5    should have been in that course; he should have been in a

6    course at least two or three levels below. And I don't

7    believe Bolingbrook even has such a course.

8            So from my perspective, he was not anywhere near

9    able to be successful in the course that he was assigned to.

10   So that, to me, would explain why he's had some academic

11   difficulties.

12           I don't think the school hasn't really met his

13   needs in terms of how he learns --

14           MR. RIORDAN:  Objection, your Honor, to the

15   narrative answer.

16           THE COURT:  Let the witness complete his statement.

17           MR. RIORDAN:  Yes, your Honor.

18   BY THE WITNESS:

19   A.   He does have difficulty learning. We have made great

20   progress. He's now to the point that he has about 85 percent

21   of his multiplication facts down. We are making some

22   progress in some of the other things, but he has a long way

23   to go to be where a ninth grade boy should be. And I

24   certainly think that -- he certainly has some difficulties in

25   this area. That's what I can speak to.

1    MR. RIORDAN: Objection, your Honor. I would like
2    to strike the portion of the testimony that's narrative
3    regarding the school requirements regarding the pre-algebra
4    classes.

5    THE COURT: Well, the fact that an answer is in the
6    narrative form in and of itself is not objectionable.

7    The problem with a narrative answer is it might
8    contain inadmissible, objectionable testimony, and the
9    opponent isn't alerted by the use that -- otherwise would be
10   alerted, by use of the question and answer system, if an
11   objectionable answer might be elicited.

12   But, Doctor, I haven't heard anything about your
13   background. It's fair to say that -- I assume that you have
14   a Ph.D. in mathematics and that's your specialty?

15   THE WITNESS: I have a Ph.D. in mathematics
16   education, so I can train teachers.

17   THE COURT: All right. I haven't heard any more of
18   that -- I'll let the answer stand, but I'll ask you to --

19   MR. COOPER: I have two more questions, your Honor.

20   THE COURT: Yes -- to elicit something that's
21   relevant to the discipline that's been --

22   BY MR. COOPER:

23   Q.    When you tutored Roger, how were you dressed?

24   A.    Roger is always dressed in a proper form. I mean, he
25   looks like any typical ninth grade kid: Blue jeans and a

1    T-shirt.  I never noticed anything different.

2          He certainly is not stylish.  He's not poorly

3    dressed, nothing out of the ordinary.

4    Q.   Do you know him to be a member of a gang?

5    A.   Certainly not.  That would be very surprising to me.

6    Q.   Why?

7          MR. RIORDAN:  Objection, your Honor.

8          THE COURT:  Sustained as to his opinion as to

9    whether someone is a member of a gang.

10         MR. RIORDAN:  Thank you.

11         THE COURT:  I don't even think the field of

12   mathematics or mathematical education reaches that, Doctor.

13   BY MR. COOPER:

14   Q.   Do you know him to be a member of a hit group?

15   A.   A what?

16   Q.   A hit group.

17         MR. RIORDAN:  Same objection, your Honor.

18         THE COURT:  Same ruling.

19         MR. COOPER:  Thank you, Doctor.

20         THE WITNESS:  Thank you.

21         THE COURT:  Do you have any cross-examination?

22         MR. RIORDAN:  No questions.

23         THE COURT:  Doctor, you may step down.

24       (Witness excused.)

25         MR. COOPER:  Roger Coronado, Sr.

1    ROGER CORONADO, SR., PLAINTIFF'S WITNESS, DULY SWORN,

2                    DIRECT EXAMINATION

3    BY MR. COOPER:

4    Q.   Please state your name for the record.

5              THE COURT:  Hold on.  Wait until he sits down.

6              And you'll have to speak out in a clear voice as to

7    what he's saying.

8              THE INTERPRETER:  Yes, your Honor.

9              THE COURT:  Okay.

10   BY MR. COOPER:

11   Q.   Please state your name for the record.

12             THE INTERPRETER:  My name is Irvin Gaston.

13             THE COURT:  No.  Here's what is going to happen:

14   Mr. Coronado is going to hear the question in English, you're

15   going to translate the question in Spanish, and Mr. Coronado

16   is going to answer in Spanish and you're going to translate

17   his answer in English.  Okay?

18             THE INTERPRETER:  Yes, your Honor.

19             THE COURT:  Okay.

20   BY MR COOPER:

21   Q.   State your name for the record, please.

22             THE INTERPRETER:  My name is Irvin Gaston.

23             THE COURT:  No, no.  You have to say to him in

24   Spanish, will you state your name for the record.  You're the

25   conduit that we're passing this through.

1          THE INTERPRETER:  I'm sorry.

2      BY THE WITNESS:

3      A.    (Through an interpreter)  His name is Regilio Coronado.

4      BY MR. COOPER:

5      Q.    And your son is Roger Coronado, Jr.?

6      A.    Yes.

7      Q.    What happened on February the 19th, 2008?

8      A.    They presented themselves at Bolingbrook School for a

9      hearing.  He doesn't exactly know the definition of a hearing

10     but it was for a hearing.

11     Q.    Then what happened?

12     A.    They arrived in and they directed him to an office, and

13     once they presented themselves, they were told to sit down.

14     Q.    Who told you to sit down?

15     A.    One of the secretaries that was there in the office.

16     Q.    Then what happened?

17     A.    They were called in the room, to enter the room.  On

18     their way to the room the secretary stood up and she gave

19     them a letter.  The secretary apologized and said they were

20     going to mail them the letter but they had forgotten, so they

21     gave him the letter then.

22          He didn't read it because they were already being

23     called into the room, so he put it away in his pocket and he

24     just headed to the office.

25          Once -- on the way in he asked the official if he

1   could have an interpreter because he didn't exactly

2   understand what a hearing was.  He was told that he wouldn't

3   need an interpreter; if he didn't understand anything, that

4   his son was there to explain to him.

5   Q.   Who was that official?  Describe him to us.

6   A.   The man in the brown suit with glasses in front.

7   Q.   Continue, please.  Then what happened?

8   A.   Once they entered they were given a sheet of paper to

9   sign, and he didn't really explain what the paper was.  He

10  just assumed that it was a paper that will just demonstrate

11  that they were -- they made an appearance at the hearing.

12  And he signed it, he gave it back to him.

13  Q.   Do you see that piece of paper in front of you marked as

14  Plaintiff's Exhibit No. 3?

15  A.   He sees his signature and the signature of his wife.

16  Q.   Is there writing above the signatures?

17  A.   Yes.

18  Q.   Was that writing there when you signed your name?

19  A.   He says he didn't see it because he just signed it when

20  he was given the paper.

21  Q.   And then what happened?

22  A.   He began to speak with Roger Coronado, Jr., about the

23  incident --

24  Q.   Who is he?

25  A.   The official.  I apologize, I don't remember his name.

1    He mentioned his name to me again.

2              They started talking about the incident and he was

3    just sitting there listening, and he started mentioning

4    things about gangs and he asked him what he was talking about

5    and he -- he was talking about gangs.  He said -- he asked

6    him if his son was involved with gangs at all and he said,

7    no, his son was involved in sports, and he had a problem with

8    his grades but that's about it.

9              He understood another word as he was speaking to

10   Roger Coronado, Jr., and it was pigs.  He asked his son what

11   it meant and basically he translated to a -- if you're going

12   to be with the pigs, you're going to be full of mud.

13   Q.   Was he referring to Mexicans as pigs?

14              MR. RIORDAN:  Objection, your Honor.

15              THE COURT:  Sustained.

16   BY THE WITNESS:

17   A.   He doesn't know what group he was referring to.

18              THE COURT:  The answer will stand.

19              Be mindful now of the time, Mr. Cooper.

20              MR. COOPER:  Yes, your Honor.

21   BY MR COOPER:

22   Q.   What did your son say to Mr. Prodehl?

23   A.   He didn't understand much.  He just was talking with his

24   son; he didn't understand much.

25   Q.   Do you have any reason to believe that your son said

1   that he was in a gang?

2   A.   No, no.

3   Q.   Did Mr. Prodehl mention any ticket to you?

4   A.   Yes.

5         He said he received a ticket and he just showed it

6   to him in the end, said that he received a letter also, he

7   didn't understand why it said gangs and signs and things of

8   that nature.  So he asked him what he should do with the

9   ticket and he said -- he recommended that he pay before the

10  date is up.

11  Q.   Did you pay?

12  A.   Yes, he went to go pay.

13  Q.   What happened on February 7, 2008?

14  A.   He was at home at 8:00 in the morning and he received a

15  call from the officer saying he needs to go pick up his son

16  from school.

17  Q.   Officer Hampton?

18  A.   He doesn't remember his name, but he was told to bring

19  $50 to pay a ticket.

20  Q.   Could you hear your son in the background?

21  A.   He heard talking in the background and he couldn't

22  really tell who -- you know, who it was, but he asked to

23  speak to somebody who would be able to explain things better

24  to him.

25  Q.   What did the officer say --

1      THE COURT:  Wait a second.  First of all, you can't

2  hold on a conversation with him, Mr. Interpreter, about the

3  question that's been asked of him.

4      And secondly, Mr. Coronado, you ought to wait until

5  the question is translated to you in Spanish before you begin

6  your answer.

7      THE INTERPRETER:  Can you repeat the question,

8  please?

9      MR. COOPER:  Court reporter, could you read back

10  the question please?

11      (Record read.)

12  BY THE WITNESS:

13  A.  He just said to go to school to pick up his son and

14  bring $50 to pay the ticket.

15      MR COOPER:  No further questions at this time.

16      THE COURT:  Do you have any cross-examination?

17      MR. RIORDAN:  I do, your Honor.

18                    CROSS EXAMINATION

19  BY MR. RIORDAN:

20  Q.  Mr. Coronado, my name is Brian Riordan.  I represent the

21  school district.

22      Sir, does your son speak both English and Spanish?

23      THE INTERPRETER:  Your Honor, I would like to

24  understand --

25      THE COURT:  You have to translate what he's saying.

1   You can't hold a conversation with him about what the

2   question was.

3   BY THE WITNESS:

4   A.   His son speaks English and his Spanish is roughly

5   80 percent, not perfect.

6   BY MR. RIORDAN:

7   Q.   Sir, if you could turn your attention to the booklet

8   that's up there, I believe, the exhibit booklet.  It looks

9   like this.  (Indicating.)

10          If you would look at Exhibit No. 2.

11          THE COURT:  Defendants' Exhibit 2.

12          MR. RIORDAN:  May I, your Honor?

13          THE COURT:  Yes.

14      (Brief pause.)

15  BY MR. RIORDAN:

16  Q.   I understand we have an interpreter here for speaking

17  purposes, but do you read English at all?

18  A.   He can read a couple things but he doesn't know the

19  definition of many things.

20  Q.   Okay.  Can you look at Page 2 of this exhibit, the

21  second page.

22          Is that your signature at the top of the page?

23  A.   Yes, it is.

24  Q.   Do you -- is it your testimony here today that you

25  received this document from the Valleyview public schools on

1 | February 12, 2007 -- I'm sorry, 2008?

2 | A.   Yes.

3 | Q.   And did you have your son assist you in reading and

4 | understanding this document?

5 | A.   No.

6 | Q.   Did you go to any other source for any other translation

7 | of this document?

8 | A.   No.

9 | Q.   But you did understand and know to appear at the school

10 | at 11:00 a.m. on February 19th, correct?

11 | A.   Yes.

12 | Q.   Why is it that you didn't get any other assistance in

13 | understanding what was contained in this letter?

14 | A.   He believed once he arrived at the set location that

15 | date, someone would be there to help him.

16 | Q.   Prior to the start of the hearing on February 19th, did

17 | you have conversations with the hearing officer, Steve

18 | Prodehl?

19 | A.   No.

20 | Q.   He didn't speak English and go over the formalities and

21 | procedures of what was going to happen with Mr. Prodehl in

22 | English?

23 | A.   He says not really because the conversation was mostly

24 | with his son rather than with him.

25 | Q.   Take a look at Exhibit 3, please, Defendants' Exhibit 3

1   in the booklet.

2           Did you have your son read this statement to you?

3           THE WITNESS:  No.

4   BY MR. RIORDAN:

5   Q.  Did you ask someone to translate this statement to you

6   so that you could understand what it was?

7           THE WITNESS:  No.

8   BY MR. RIORDAN:

9   Q.  This is your signature here on this document?

10          THE WITNESS:  Si.

11  BY MR. RIORDAN:

12  Q.  So you signed it without having any idea what it said?

13  A.  (Through the interpreter)  Yes, he signed it without

14  knowing what it was.

15  Q.  Why would you do that, sir?

16  A.  He just believed it was a document that would prove that

17  they were there at the hearing.

18  Q.  Did you have your son interpret or help you understand

19  what was happening at the hearing at all?

20  A.  No, because the conversation was mostly with his son

21  than with him.

22  Q.  What questions did you have at the hearing that you

23  weren't able to understand about the process?

24  A.  He didn't have any questions because his son has a clean

25  slate, so he didn't really know what was going on.

1    THE COURT:  Earlier you told me you had four

2  witnesses.

3    MR. COOPER:  Your Honor, I had no plans --

4    THE COURT:  And then you told me you wanted to call

5  Mr. Coronado and Dr. --

6    MR. COOPER:  I'll do what the Court thinks is best.

7    THE COURT:  Well, I told you that you had a certain

8  amount of time.  But Mrs. Coronado was not mentioned as a

9  witness before.

10    MR. COOPER:  No, she wasn't, your Honor.  She

11  wasn't necessary up until this point.

12    THE COURT:  Why is she necessary now?

13    MR. COOPER:  Your Honor, I think she can

14  corroborate Mr. Coronado's testimony and do it very well.

15    THE COURT:  How much time do you need?

16    MR. COOPER:  I would like to think less than ten

17  minutes, your Honor.

18    THE COURT:  All right.

19    MR. COOPER:  Mrs. Coronado?

20    BLANCA CORONADO, PLAINTIFF'S WITNESS, DULY SWORN

21    THE COURT:  You may proceed.

22                  DIRECT EXAMINATION

23  BY MR. COOPER:

24  Q.  Please state your name for the record.

25  A.  My name is Blanca Coronado.

1    Q.    Is your son Roger Coronado?

2    A.    Yes.

3    Q.    What happened on February the 4th -- correction,

4    February the 7th, 2008?

5    A.    (Through an interpreter)  She was working and her

6    manager gave her a call that she had received.

7    Q.    Excuse me?

8            THE INTERPRETER:  Her manager relayed a call to her

9    that she had received.

10            MR. COOPER:  She had received a call?

11            THE INTERPRETER:  Yes.  Her manager told her she

12    had a call and she took the call.

13    BY MR COOPER:

14    Q.    Who was on the phone?

15    A.    From what she understood, it was somebody from the

16    police.

17    Q.    And what did you do?

18    A.    She asked for them to call her husband, who was at home,

19    because he's the head of the family.

20    Q.    What happened on February the 19th, 2008?

21    A.    They had a meeting when they arrived at the office where

22    they were sat down.  A person, the secretary, told them to

23    sit down and wait.  And then once they were going to enter

24    the office, the secretary stood up and gave her husband a

25    letter in an envelope and she apologized, saying that they

1   were going to send it in the mail but they didn't.

2   Q.   And then what happened?

3   A.   The man with the glasses, the hearing officer, presented

4   himself and said he was the one who was going to be at the

5   hearing.

6        Before they sat down -- well, her husband, before

7   they sat down -- well, they asked them if they could have an

8   interpreter because they don't speak perfect English.  They

9   wanted to better understand what was happening or what the

10  hearing was going to be about.

11  Q.   And what did Mr. Prodehl say to you?

12  A.   He said no.  He said that he believed that they didn't

13  need an interpreter, that if they had anything that they

14  needed to understand, that's what their son was there for.

15  Q.   Did Mr. Prodehl mention a ticket?

16  A.   At the moment, no.

17  Q.   At another point in the hearing?

18  A.   What ticket?

19  Q.   A summons, a -- I don't know --

20        MR. RIORDAN:   Objection to have the witness ask the

21  attorney questions.

22        MR. COOPER:   I don't speak Spanish.

23        We will leave the question alone.  I'll withdraw

24  the question.  I can't think of a synonym other than summons.

25        No further questions at this time.

1    THE COURT:  You may step down -- or I'm sorry.  Do

2    you have any cross?

3    MR. RIORDAN:  Just very quick, your Honor.

4                        CROSS EXAMINATION

5    BY MR. RIORDAN:

6    Q.  Ms. Coronado, you just described a number of

7    conversations that took place just prior to the hearing.

8    A.  She isn't sure of the question.  Can you put it in a

9    question?

10   Q.  Sure.

11         Was your son translating everything that was being

12   said prior to the start of the hearing during this

13   conversation that you just testified to between yourself and

14   Mr. Prodehl?

15   A.  No, because the son started with her son.

16   Q.  What I'm trying to understand is that -- you just gave a

17   very nice rendition and explanation about what your

18   conversations were prior to the hearing starting, and I don't

19   understand how you understood what was being said and how you

20   held that conversation.  Can you explain that to me?

21   A.  She didn't speak.  She didn't speak.  She just heard.

22   She understood the conversation took place.

23   Q.  So you can understand English?

24   A.  Not much.

25   Q.  But you were just able to recite your entire

1    conversation when you were being asked questions by your

2    son's counsel about what happened at the hearing.  How did

3    you gain that knowledge?

4    A.    That's why they asked for an interpreter.

5    Q.    I'm not talking about things that needed to be

6    interpreted.  I'm asking how you understood as well as you

7    did, in terms of telling us what happened at the hearing,

8    without an interpreter?

9    A.    He didn't ask her anything.

10            THE COURT:  He what?  What did he say?

11            THE INTERPRETER:  I said, he didn't ask her

12    anything.

13    BY MR. RIORDAN:

14    Q.    Again, that's not my question.  And I'll ask it one more

15    time, and we'll move on if you can't understand where we're

16    going here.

17            You just gave a rendition of what happened, about a

18    secretary handing you a letter saying, we're sorry we forgot

19    to send this, that at the hearing you were asked to signed

20    stuff.  You just gave your whole rendition of what happened

21    at the hearing.

22            I would like to know how it is you understood what

23    was being said at the hearing if there was no interpreter

24    there?

25    A.    From what little her husband understood, she would ask

1  |  him.

2  |  Q.   And he would explain to you what was going on?

3  |  A.   Not all of it.

4  |          MR. RIORDAN:  That's all I have, your Honor.

5  |          MR. COOPER:  No further questions, your Honor.

6  |          THE COURT:  You may step down, Ms. Coronado.  Thank

7  |  you.

8  |          (Witness excused.)

9  |          THE COURT:  You rest, Mr. Cooper?

10  |          MR. COOPER:  Yes.

11  |          THE COURT:  Call your first witness.

12  |          MR. RIORDAN:  With that, first I would like, for

13  |  the record, to request by oral motion that a directed finding

14  |  be held that the --

15  |          THE COURT:  That will be overruled.

16  |          MR. RIORDAN:  -- plaintiff has not come close to

17  |  meeting their burden --

18  |          THE COURT:  Overruled.

19  |          MR. RIORDAN:  -- appropriate procedure and --

20  |          THE COURT:  That will be overruled.

21  |          MR. RIORDAN:  -- procedural and substantive due

22  |  process rights.

23  |          I would like to call Officer Hampton.  Less than

24  |  five minutes, again.

25  |          THE COURT:  Okay.

Hampton - direct                                    123

1        MR. RIORDAN:  Then I have one witness after that.

2    ALAN KEITH HAMPTON, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

3            THE COURT:  Sir, you realize you're still under

4    oath?

5            THE WITNESS:  Yes, your Honor.

6            THE COURT:  You may inquire, Mr. Riordan.

7                    DIRECT EXAMINATION

8    BY MR. RIORDAN:

9    Q.   Officer, you were here during the testimony of Roger

10   Coronado?

11   A.   Yes, I was.

12   Q.   Did you in any way at any time, during your interactions

13   with him on February 7th, threaten him?

14   A.   No, I did not.

15   Q.   Did you force him to sign a confession?

16   A.   No, I did not.

17   Q.   Did he fill out that form himself in his own hand?

18   A.   I believe so.

19   Q.   Did you slam any doors in his presence?

20   A.   No, I did not.

21   Q.   Did you kick any chairs?

22   A.   No, I did not.

23           MR. RIORDAN:  Those are the only questions I have.

24   I just wanted to clear that up.

25           THE COURT:  Do you mind if I ask a question?

1        MR. RIORDAN:  I don't mind.

2        THE COURT:  Did you call Mr. Coronado, Sr., at home

3    or at work?

4        THE WITNESS:  As far as I recall, I'm not sure

5    because we dealt with more than one student that day.  I did

6    contact some parents.  I don't know whose parents I

7    contacted.

8        THE COURT:  Do you have any cross-examination?

9                    CROSS EXAMINATION

10   BY MR COOPER:

11   Q.   Did you strike Michael Clinton or any part of his body?

12   A.   No, I did not.

13        MR. RIORDAN:  Who?

14        MR. COOPER:  Michael Clinton.

15        MR. RIORDAN:  Objection to relevance.

16        THE COURT:  Overruled.

17   BY THE WITNESS

18   A.   No, I did not.

19   BY MR. COOPER:

20   Q.   Did you treat Michael Clinton with professionalism?

21   A.   Yes, I did.

22   Q.   Did you order Michael Clinton to sign a confession --

23   A.   No --

24   Q.   -- or a referral?

25   A.   No, I did not.

1    Q.    Have you ever been disciplined by the Bolingbrook Police

2    Department?

3                MR. RIORDAN:  Objection.  Relevance, your Honor.

4                THE COURT:  Sustained.

5                MR. COOPER:  Your Honor, if I may ask the officer,

6    has -- if he's been reprimanded for any light behavior?

7                MR. RIORDAN:  Same objection, your Honor.

8                THE COURT:  Sustained.

9    BY MR. COOPER:

10   Q.    Did you telephone Mrs. Coronado?

11   A.    As I said earlier, I do not believe -- I don't remember

12   which parents I spoke to that day.  I spoke to a variety of

13   parents, several parents.

14   Q.    Are you aware that there's a camera in the room?

15   A.    In this room?

16   Q.    No.  That there's a camera in the police station.

17   A.    Am I aware that there's a camera?

18   Q.    Yes.

19   A.    In the police room?

20   Q.    Yes.

21   A.    No, I'm not aware of that.

22   Q.    What was your probable cause to give my client a ticket?

23   A.    Based on the information that was given to me from the

24   school and the referral that I read, and based on what he

25   told me when we were in the room.

1    Q.    How tall are you?

2    A.    Six-six.

3    Q.    How much do you weigh?

4    A.    250.

5    Q.    How tall is Michael Clinton?

6              MR. RIORDAN:  Objection to relevance, your Honor.

7    Michael Clinton --

8              THE COURT:  Do you have that in mind, how big

9    Michael Clinton was?

10   BY THE WITNESS:

11   A.    I don't know who he is.

12   BY MR. COOPER:

13   Q.    How tall do you think my client is?

14             MR. RIORDAN:  Objection, your Honor.

15             THE COURT:  I'll let the record reflect that Mr.

16   Coronado is probably around five-five or five-six.

17             Is that right, Mr. Coronado?

18             THE WITNESS:  I don't know.

19             THE COURT:  Maybe a little taller, maybe 140,

20   150 pounds.

21             Let's move on.

22   BY MR COOPER:

23   Q.    Are you aware that he's a boy?

24   A.    Yes.

25   Q.    And you're a grown man?

1   A.   Yes.

2        THE COURT:  Mr. Cooper, please, ask him questions

3   that will elicit relevant information.

4   BY MR COOPER:

5   Q.   Do you believe that he's making things up when he says

6   that you threatened him?

7   A.   Repeat the question.

8   Q.   Do you believe that he's making things up when he says

9   you threatened him?

10  A.   Yes.

11  Q.   So Michael Clinton is not going to say that you struck

12  him by way of a chair?

13        MR. RIORDAN:  Objection, your Honor.

14        Is he going to tie this up?

15        Is Michael Clinton here or are we just --

16        THE COURT:  Yes.  Are you going to be able to tie

17  this up, Mr. Cooper?

18        MR. COOPER:  Not at this time, your Honor.

19        No further questions.

20        MR. RIORDAN:  I have nothing further, your Honor.

21        THE COURT:  Thank you, Officer.  You may step down.

22        THE WITNESS:  Thank you, your Honor.

23     (Witness excused.)

24        MR. RIORDAN:  Next is Principal Mitchem.

25     JAMES MITCHEM, DEFENDANTS' WITNESS, DULY SWORN

1    School as a result of those three things.

2         Now, I'm not saying he needs counseling, and I'm

3    not saying that absent counseling the Board of Education

4    would not potentially reconsider his expulsion. I'm saying

5    that in my career of the district, those three factors have

6    weighed heavily in the decision that the Board of Education

7    makes as it applies to kids returning.

8    Q.   What did you discuss with Roger Coronado, Jr.?

9    A.   Excuse me?

10   Q.   What did you discuss with Roger Coronado, Jr.?

11   A.   I didn't discuss anything with him.

12   Q.   Isn't it your testimony that you follow each case and

13   that you meet with each student?

14   A.   That engages in a fight. That's what I said.

15   Q.   I thought he was in a fight?

16   A.   I never said he was in a fight. I said he was engaged

17   in a mob action.

18   Q.   Describe the mob action, please?

19   A.   A mob action is two or more people --

20   Q.   Describe the mob action involving him.

21   A.   That was described previously.

22         THE COURT: Counsel, we have been around this --

23   BY THE WITNESS:

24   A.   That was described. I was not at that mob action.

25         MR. COOPER: Your Honor, the principal says that he

1    reviews all documentation, so I would like to know from the

2    principal what it is that Roger Coronado did, other than

3    stand up -- he exercised his First Amendment right to get out

4    of the way.

5    BY MR. COOPER:

6    Q.    So what did he do?

7    A.    And again, I guess that is open for interpretation,

8    because what I'm hearing are two different things.   I'm

9    hearing my staff say one thing and I'm hearing Roger Coronado

10   say another thing.

11              I'm hearing you say that he stood up and exercised

12   his First Amendment right to get out of the way.   I'm hearing

13   my staff say that he was a willing participant who chose to

14   engage in a mob action, and as a result, was disciplined for

15   that.

16              So I guess it's for this Court to decide, in fact,

17   whether or not he was a willing participant or whether he was

18   not.

19   Q.    What did the mob do?

20   A.    The mob engaged in threatening remarks towards each

21   other, the mob engaged in profanity, the mob engaged in

22   gang-like behavior through signing.   And, in fact, it is my

23   belief that if our security personnel had not intervened at

24   that time, based on past history that mob action would have

25   ended up in a full-fledged fight.   But thankfully our

1  security was on scene in enough time and professional enough

2  to prevent this mob action from escalating into an actual

3  fight.

4  Q.   When did Roger Coronado engage in mob action prior to

5  February 4th, allegedly?

6  A.   To my knowledge, he has not.

7  Q.   So why is he expelled for one year?

8  A.   We determined how egregious we perceive the act to be at

9  our administrative council. We considered that act to be

10 egregious given that the allegation was that I had Gangster

11 Disciples and Latin Kings squaring off with each other based

12 on the testimony and eyewitness account of the people who

13 witnessed it.

14 Q.   Why didn't Mr. Gavin go to the hearing?

15             MR. RIORDAN:  Objection.

16 BY THE WITNESS:

17 A.   I will answer that one more time --

18             THE COURT:  We have been around that.  Sustained.

19 BY MR. COOPER:

20 Q.   How many students were suspended?

21             THE WITNESS:  Am I allowed to answer that?

22             THE COURT:  Yes.

23 BY THE WITNESS:

24 A.   For this particular board meeting we had 23 students

25 recommended for expulsion.

 1  disciplinary contract that indicates that if, in fact, you

 2  continue with this type of rules infraction, you can be

 3  recommended for expulsion or you can be suspended for X

 4  amount of days.

 5  Q.  Why wasn't he given a contract?

 6  A.  Again, it depended on our definition of how egregious we

 7  felt the rules infraction was.  It is within our discretion

 8  to determine who we will put on contract and who we will not.

 9       Based on the events of that day, everyone who was

10  involved in any one of those three incidents was not afforded

11  the right to be put on a contract and was recommended for

12  expulsion.

13  Q.  If he's so violent, why did you wait until February 7th

14  if the incident occurred on February 4th?

15       MR. RIORDAN:  Objection to the form of the

16  question.

17       THE COURT:  Overruled.  You can ask the question.

18  You're going to have to move on here, Mr. Cooper.

19  BY THE WITNESS:

20  A.  I never said he was violent.

21  BY MR COOPER:

22  Q.  Didn't you testify that --

23  A.  I never said he was violent.

24  Q.  Didn't you testify, sir, that the group could become

25  violent?

1    A.    I said yes, they could become violent.

2    Q.    Then why did you wait until February 7th to have the

3    police come in and talk with him?

4    A.    The incident happened on a Friday, correct?  Yes, it

5    happened on a Friday.  The 7th is a Monday.  So with that

6    number of students, it is not possible for us to be able to

7    follow through --

8    Q.    It happened on a Monday.

9    A.    Okay.  It happened on a Monday?

10   Q.    Why did you allow him to go to school until the 7th?

11   A.    Was he in school the 5th and 6th?

12   Q.    Of course he was.

13          MR. RIORDAN:  If you don't know, you don't know.

14   Just answer --

15          THE WITNESS:  I don't know that answer.

16          THE COURT:  Don't do that, Counsel.

17   BY MR COOPER:

18   Q.    Mr. Mitchem, I'm showing your attorney a piece of paper

19   that I took from the internet that describes Premier Academy.

20   And I had no intentions of using it today, but I have now

21   marked it as Plaintiff's Exhibit No. 11.

22          MR. RIORDAN:  This is not my copy?

23          MR. COOPER:  I made one copy.

24          THE COURT:  Can you move along, Mr. Cooper?

25          MR. COOPER:  Yes, your Honor.  I'm about through.

1    MR. RIORDAN:  I have to read it.  I don't know what

2    it is.

3        (Brief pause.)

4        MR. RIORDAN:  Do you have a copy for the witness so

5    he can review it before you ask him questions about it?

6        THE COURT:  Would you please just confine yourself

7    to making objections when it's your turn to speak?

8        MR. RIORDAN:  Judge, if he's going to ask --

9        THE COURT:  Why don't we let him proceed as he sees

10   fit.  If you believe it's improper, you can object.

11       MR. RIORDAN:  Thank you.

12       THE COURT:  It's not appropriate for you to

13   instruct the witness how to testify while he's on

14   cross-examination, nor to instruct other lawyers what to do

15   with exhibits.

16   BY THE WITNESS:

17   A.   I didn't read the whole thing but I generally understand

18   what it's saying.

19   BY MR COOPER:

20   Q.   Do you believe it's from Premier Academy, their website?

21   A.   This is from an org website, which -- my understanding

22   of org is an organizational website.  Usually educational

23   websites are edu websites.

24       So I don't know who the source of this article is,

25   but it's not an educational website.

1    Q.    It's the State of Illinois, but that's not important --

2              THE COURT:  Would you ask a question, please?

3              MR. COOPER:  Yes, your Honor.

4              THE COURT:  Thank you.

5    BY MR COOPER:

6    Q.    Premier Academy is a school for disruptive students, am

7    I correct?

8    A.    That's correct.

9    Q.    Was Mr. Coronado expelled because he has C grades?

10    A.    He does not have C grades.

11    Q.    Was he expelled because of his grades?

12    A.    He was not expelled because of his grades.  His grades

13    were taken into consideration, as they are with every student

14    that we potentially recommend for expulsion.

15    Q.    Do students go to Premier Academy because they have low

16    grades?

17    A.    Students go to Premier Academy from our district because

18    they violated a rule in our building that we perceive to be

19    egregious enough to recommend an expulsion.

20    Q.    And you believe that this boy belongs in that

21    environment?

22    A.    Without a doubt.

23    Q.    Why is that?

24    A.    Because of the explanation of the rules infraction that

25    has been gone over several times in this courtroom.

1   Q.   Mr. Mitchem, I'm almost through.

2          Is there a surveillance camera in the cafeteria?

3   A.   Yes, there is.

4   Q.   Did you review the footage?

5   A.   Yes, I did.

6          MR. COOPER:   I would like to see that footage at

7   some point, on the record.

8          THE COURT:   Why don't you ask questions?  We're at

9   that stage of the proceedings now, Mr. Cooper.

10          MR. COOPER:   Yes, your Honor.

11   BY MR COOPER:

12   Q.   Once again, you stated that you interview each student

13   and you look at their academic history?

14   A.   I interview every student that engages in a fight.

15   Q.   Why did you not talk with Roger Coronado, Jr.?

16   A.   Roger Coronado, Jr., did not engage in a fight.  He

17   engaged in a mob action.

18   Q.   Describe the mob action.

19          THE COURT:   We have been over this now.  This is

20   enough.

21   BY MR COOPER:

22   Q.   Sir, are you familiar with Illinois Statute 51022.6?

23   A.   Not off the top of my head.  I would have to look that

24   up.

25   Q.   The statute describes the manner in which hearings are

1    to be conducted, specifically expulsion hearings.

2    A.    Okay.

3    Q.    Are you aware that Mr. Coronado has a right to confront

4    his accusers?

5            MR. RIORDAN:  Objection, your Honor.

6            THE COURT:  Sustained.

7            MR. COOPER:  Thank you.

8            THE COURT:  We have been over this several times.

9    You can submit authority as to where you believe the legal

10   deficiencies have been proven based on the facts.

11           MR. COOPER:  Your Honor --

12           THE COURT:  Let's move along then.  We're going to

13   have to --

14           MR. COOPER:  This is my last question, and if it

15   doesn't fly I have to accept it.

16   BY MR. COOPER:

17   Q.    Did you participate in preparing the student handbook?

18   A.    I did not participate directly in preparing the student

19   handbook.  I do participate indirectly.

20   Q.    Are you familiar with a court decision known as Chicago

21   versus Morales?

22           MR. RIORDAN:  Objection.

23           THE COURT:  Sustained.

24   BY THE WITNESS:

25   A.    No.

1    March 26th.

2              MR. RIORDAN:  Thank you, your Honor.

3              THE COURT:  We'll stand in recess.

4              MR. COOPER:  Thank you, your Honor.

5              MR. RIORDAN:  Thank you, your Honor.

6         (Which were all the proceedings heard.)

7                        CERTIFICATE

8         I certify that the foregoing is a correct transcript

9    from the record of proceedings in the above-entitled matter.

10

11   _____        _____

     Mary M. Hacker                      Date
12   Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25